875 So.2d 6 (2004)
BREVARD COUNTY, Florida and the Brevard County Mosquito Control District, Appellants,
v.
Michael BLASKY and Anita Blasky, Appellees.
No. 5D03-2934.
District Court of Appeal of Florida, Fifth District.
April 30, 2004.
Rehearing Denied June 23, 2004.
*9 Eden Bentley of Brevard County Attorney's Office, Viera, and C. Allen Watts of Cobb & Cole, DeLand, for Appellant.
Edward C. Tietig, Palm Bay, for Appellee.
MONACO, J.
The appellants, Brevard County and the Brevard County Mosquito Control District (the "District"), appeal an Order of Taking concluding that the District has taken the real property of the appellees, Michael and Anita Blasky, by inverse condemnation. Brevard County and the District both defended this suit on a number of theories, including: that the land in question was dedicated by implication by a prior land owner; that the District had an irrevocable license which barred inverse condemnation; that the statute of limitations for a claim of inverse condemnation had run; and that, in any event, some of the land in question is sovereign submerged land and is owned by the State of Florida. After a non-jury trial the lower court disagreed with both the County and the District on these and all other bases. We do, too.

I. FACTS.
In 1978, Mr. and Mrs. Blasky purchased a 40-acre parcel located on the north side of the Port Canaveral Barge Canal on Merritt Island in Brevard County. Their residence is on the higher 13 acres of the property. The remaining 27 acres of marshy land is at the heart of the dispute.
Mr. and Mrs. Blasky trace their title to a 1906 deed from the Trustees of the Internal Improvement Fund to the Florida Coast Line Canal and Transportation Company. The deed from the Trustees contained no conditions or reservations of retained rights, and specifically granted all riparian rights to the grantee. The Blaskys were granted title of the same quality.
In 1954, a predecessor in title to Mr. and Mrs. Blasky granted to the District an unrecorded "easement" of ten years' duration for purposes of mosquito control with respect to about 80 acres of land owned by the predecessor, including the 27 acres in question. Although the document was labeled an easement, it used the terms, "license," "licensor," and "licensee" within its body. The document authorized the District to enter the land, to construct dikes and dams around it, and then to flood the diked lands and to maintain the water level at a depth suitable to the District's purposes. The idea was to control mosquito habitat. As salt marsh mosquitos only lay eggs in mud, their reproduction could be interrupted and controlled by keeping the area flooded.
The record is silent with respect to what happened after the ten years elapsed. The next significant legal event occurs in 1978, when Mr. and Mrs. Blasky bought the property. They, of course, admitted that they knew of the impoundment and of the improvements installed by the District (Mr. Blasky is a real estate broker and, as one can imagine, the new owners fully supported mosquito control in the area), but neither they, nor the District had any discussion on the subject of the District's continued use of the land until 1992. In that year the District wrote to Mr. and Mrs. Blasky and offered either to purchase the 27 acres from them outright, or to obtain a recordable easement. In exchange for the latter, the District offered to grant the Blaskys certain tax relief regarding *10 the land. Mr. and Mrs. Blasky were not inclined to accept either proposal, but did write a letter in 1994, that gave their revocable permission to the District to continue to flood and regulate the depth of waters on the 27 acres, but only for mosquito control purposes. The Blaskys neither asked for, nor received any consideration for the grant of this limited privilege to the District, and continued to pay the full amount of real property taxes levied on the property.
A year later, as noted by the trial judge, "the fur began to fly." Brevard County had a Stormwater Management Plan prepared for North Merritt Island, including the troublesome 27 acres. After a fuss about who was trespassing on whose land, the Florida Department of Environmental Protection, asserted title to the Blasky's property and contested their right to maintain a foot bridge over a feeder canal from their home to the 27 acre impoundment. The feeder canal was part of the "easement" area being used by the District as part of the 1954 agreement. Threats of $10,000 per day fines ensued to the considerable consternation of Mr. and Mrs. Blasky. Brevard County then got into the act and instituted its own code violation proceeding against the Blaskys for failure to obtain a permit for the bridge. Mr. and Mrs. Blasky then learned that the Stormwater Plan reflected that their 27 acres would be used as a stormwater storage area without their consent, and without compensation. Finally, Mr. and Mrs. Blasky discovered in 1997, that the Stormwater Plan actually prepared for and received by Brevard County showed that the 13 acres on which their residence was located, as well as the 27 acres in the impoundment, were both in the stormwater storage area. The trial judge viewed the inclusion of the Blasky home in the stormwater plan as "cavalier and irresponsible," and lamented that "someone writing the plan did not even take the trouble to see if any portion of the plan contained a home."
It should not have come as a surprise to either the District, Brevard County, or the Florida Department of Environmental Protection that in 1998, Mr. and Mrs. Blasky sent the District and County a letter revoking their permission for the District to use their 27 acres. The District, however, ignored the letter and continued to use the area despite the revocation of permission. Eventually, the Blaskys brought suit for inverse condemnation and other relief.
After a two day non-jury trial during which the trial judge received 59 exhibits and considered the lay and expert testimony of ten witnesses, the court rejected the District's defenses and determined that the District had taken the Blasky's land. This appeal followed.

II. DEDICATION BY PRIOR AND CURRENT OWNERS.
The District maintains that the predecessors in title to Mr. and Mrs. Blasky acquiesced in the construction of the mosquito control impoundment on the 27 acres for many years after the original ten year "easement" concluded. Thus, according to the District, the silence of the Blaskys and their predecessors worked a dedication by implication. The trial court rejected this position.
Common law dedication is the setting apart of land for public use. See City of Miami v. Florida East Coast Ry. Co., 79 Fla. 539, 84 So. 726 (1920). To constitute a dedication, whether an express dedication or an implied dedication, there must first be shown a clear intention by the owner, as indicated by his or her words or acts, to offer the land for public use. Thereafter, there must be an acceptance of the dedication by the public. See Hollywood, Inc. v. Zinkil, 403 So.2d 528 *11 (Fla. 4th DCA 1981). The quality of proof required of the intention to dedicate is "clear and unequivocal," and the burden of proof is on the party asserting the existence of the dedication. See Star Island Assocs. v. City of St. Petersburg Beach, 433 So.2d 998, 1003 (Fla. 2d DCA), review denied, 440 So.2d 351 (Fla.1983).
Although the act of dedication is affirmative in character, it does not necessarily have to be accomplished by a formal act or formal dedication. Dedication may also result from the conduct of the owner. See Mainor v. Hobbie, 218 So.2d 203, 205 (Fla. 1st DCA 1969). Thus, dedication can be accomplished by a written grant, or affirmative acts, or even permissive conduct on the part of the dedicator. However the owner sees fit to indicate the intention to dedicate the land to the public use will meet the requirements of the common law. See City of Palmetto v. Katsch, 86 Fla. 506, 98 So. 352, 353 (1923).
In a seminal opinion by Justice Terrell, the Florida Supreme Court identified the most common ways to express one's intention to dedicate lands for public use:
(1) written instrument executed for that purpose; (2) filing a plat or map of one's property designating thereon streets, alleys, parks, etc.; (3) platting one's lands and selling lots and blocks pursuant to said plat indicating thereon places for parks, streets, public grounds, etc.; (4) recitals in a deed by which the rights of the public are recognized; (5) oral declarations followed by acts consistent therewith; (6) affirmative acts of the owner with reference to his property, such as throwing it open in a town, fencing and designating streets thereon; (7) acquiescence of the owner in the use of his property by the public for public purposes.
Katsch, 98 So. at 353. Justice Terrell went on to say, however, that mere use by the public over an extended period can be regarded only as a license that is revocable at the pleasure of the owner, unless public and private interests "have been acquired upon the faith of the supposed dedication, which would be materially impaired if the dedication were revoked." Id.
Similarly, the acceptance of the dedication by the public does not have to be by a formal act, but may be implied by the improving or repairing of the property, or from any act with respect to it that clearly indicates an acceptance. See Smith v. City of Melbourne, 211 So.2d 66, 68 (Fla. 4th DCA 1968). Once again, however, the acceptance of the dedication must be clear, satisfactory and unequivocal. See City of Miami Beach v. Miami Beach Improvement Co., 153 Fla. 107, 14 So.2d 172, 175 (1943). Thus, in Smith, the Fourth District Court of Appeal held that where the defendant's predecessor in title had not protested when a road was constructed over her property many years before, and the deed conveying the property to the defendants stated that the land was subject to a road right-of-way, a common law dedication was accomplished, and the defendants were not entitled, to compensation when the city widened the road.
The arguments of the parties in connection with the dedication issue can be simplified, as follows. The District says that Mr. and Mrs. Blasky and their predecessors were silent between 1964 and 1994, while the impoundment was maintained by it. Mr. and Mrs. Blasky say that there was no evidence introduced at trial to show that the silence was intended as a dedication. In fact, Mr. Blasky testified specifically that he never intended to dedicate the 27 acres for public use, and that his actions substantiate his lack of intent in this regard. The District admits that the *12 only written evidence on this issue was the 10-year easement that it obtained in 1954. No evidence, written or oral, was introduced to show that any previous title holders intended to dedicate the land to the public.
Moreover, the Blaskys point out that the fact that there was originally a 10-year easement granted by their predecessors to the District confirms that a permanent easement was never intended. When considered in tandem with the 1992 request from the District to secure from Mr. and Mrs. Blasky a more durable right to occupy the 27 acres, the obvious implication is that even the District did not think at that time that it had a permanent right to use the land by reason of a dedication. Finally, the 1994 letter from Mr. and Mrs. Blasky to the District giving revocable permission to continue to use the land for mosquito control purposes strongly suggests that the Blaskys had never intended to make a permanent dedication of the land. Given the requirement that the party advancing the claim of dedication prove its position with clear and unequivocal evidence, we cannot disagree with the trial judge that the affirmative defense of dedication was not proved by either Brevard County or the District.

III. IRREVOCABLE LICENSE.
The County and the District next posit that the District holds an irrevocable license to the 27 acres based on the extensive improvements that it constructed to create the mosquito control impoundment. A license, in this context, is simply a permit to use another's property. It conveys no interest in the land and may not be assigned or conveyed by the licensee. See Brown v. Rice, 716 So.2d 807, 809 (Fla. 5th DCA), review denied, 727 So.2d 903 (Fla.1998). Rather, it is a personal privilege, and generally may be revoked at the pleasure of the grantor. The right of revocation may be compromised, however, if permission is granted to use the property for a particular purpose or in a certain manner, and if the licensee has expended large sums or incurred heavy obligations for the permanent improvement of the property to which the license applies. See Seaboard Air Line Ry. Co. v. Dorsey, 111 Fla. 22, 149 So. 759, 761 (1932); Dupont v. Whiteside, 721 So.2d 1259, 1263 (Fla. 5th DCA 1998). This court has recognized, however, that an "irrevocable license" only arises under very narrow circumstances, and is applied only to the extent required to prevent inequity. See Tatum v. Dance, 605 So.2d 110, 113 (Fla. 5th DCA 1992), approved, 629 So.2d 127 (Fla.1993). Its duration, moreover, is limited only to the time necessary to protect the reliance investment of the licensee. See Id.
In the present case the predecessor in title to Mr. and Mrs. Blasky gave the District a document in 1954, that purported to establish an "easement" of ten years' duration. The parties to that document, however, are referred to as "licensor" and "licensee," and the document provides that the licensor shall retake control of the property prior to the expiration of the term. More specifically the document states:
It is mutually agreed that licensor may release any portion of the diked area from this easement; provided, Licensee will construct and maintain at his own expense and at no cost to Licensee [sic], a dike around the area so released from this easement.
We conclude that despite its name, the document is a license, not an easement. An easement, which is an interest in land, and runs with the land, cannot ordinarily be revoked by the grantor without the consent of the grantee. As a license is not *13 an interest in land, it cannot be assigned or conveyed, and is generally revocable by the licensor. See Dupont, 721 So.2d at 1263; Brown. If the language of an agreement reflects that the grantor can revoke permissive rights under certain circumstances, the agreement can typically be no more than a license. See Jabour v. Toppino, 293 So.2d 123, 127 (Fla. 3d DCA 1974). Because the 1954 agreement fits this definition, it is a license.
The more important subset of this discussion concerns whether the license became irrevocable at some time before Mr. and Mrs. Blasky rescinded the license in 1998, because of some inequity that would result to the licensee. See Tatum. The District points to the expenditure it made in creating an 800-acre impoundment that includes the 27 acres belonging to Mr. and Mrs. Blasky. But it was quite willing to make this investment on the basis of a relatively short term 10-year license in 1954. Moreover, there was no evidence presented at trial regarding the cost of building the impoundment or whether any inequity would result by withdrawing 27 acres from the 800 acre project. Finally, it is abundantly clear that the District believed in 1992 that it had an impermanent license to use the property because it tried for two years to effect a more permanent relationship. The District seemed perfectly happy to rely on the 1994 Blasky letter giving it continued permission to use the 27 acres for mosquito control. The trial judge apparently concluded that the District and Brevard County failed to demonstrate that an inequity would result from revocation of the license.
We find ourselves in agreement with the ultimate finding of the trial court that the District and Brevard County failed to establish the affirmative defense that the license was irrevocable. Because the District failed to establish the irrevocability of the license, Mr. and Mrs. Blasky were free to revoke it at any time.

IV. SUBMERGED LANDS.
We last consider the argument of Brevard County and the District that because some of the 27 acres in an area known as Sykes Creek is navigable, the land beneath the navigable portion belongs to the State of Florida, and not to Mr. and Mrs. Blasky.[1] The County and the District argue from this premise that Mr. and Mrs. Blasky would not be entitled to compensation for the taking of lands that belong to the State, and that the trial court erred in its determination that the Blaskys are entitled to be compensated for the entirety of the 27 acres.
Title to lands under navigable water is held by the state pursuant to Article X, Section 11, of the Florida Constitution. The determination of navigability is to be made as of 1845, the date Florida became a state. See Board of Trustees of Internal Improvement Trust Fund v. Florida Pub. Util. Co., 599 So.2d 1356, 1357 (Fla. 1st DCA), review denied, 613 So.2d 4 (Fla.1992) (citing Odom v. Deltona Corp., 341 So.2d 977, 988 (Fla. 1976)). Whether a body of water is navigable depends upon the application of existing law to the particular facts of each case. See Florida Pub. Util. Co. at 1358.
Navigability is generally a question fact. See Odom, 341 So.2d at 988. Whether a body of water is navigable depends on whether the body of water is *14 permanent in character, and whether in its ordinary and natural state, it is navigable for useful purposes and so situated that it may be used for purposes common to the public in the locality where it is located. See State Bd. of Trustees of Internal Improvement Trust Fund v. Laney, 399 So.2d 408, 409-10 (Fla. 3d DCA 1981). The facts that are relevant to the issue of navigability include the physical characteristics of the body of water (such as size and depth), and other conditions that make the water body useful for public purposes; and the manner and extent of public or private commercial or recreational usage. See Florida Pub. Util. Co., 599 So.2d at 1357.
The trial court began his analysis of the evidence of navigability as follows:
Baron Sykes had it easy. All he had to do was wrestle an alligator in 1857 up a stream that now bears his name because of the incident. It is left to the undersigned to determine how far north a log could have then floated on that same Creek one hundred-forty-six years later. I presume both the Baron and the alligator are dead and cannot be of any help.
After a detailed review of the evidence related to the history and physical characteristics of Sykes Creek, the trial judge found as a fact that:
At all times relevant to this case, the east 27 acres were not navigable and therefore not sovereign lands under the test set forth in Florida Board of Trustees v. Public Utilities Co., 599 So.2d 1356 (Fla. DCA 1st 1992)(sic), cited by Defendants and thus subject to private ownership and condemnation. This property was taken from the Plaintiffs on June 22, 1998.
Upon review of the record, we conclude that there is substantial competent evidence undergirding the finding of the trial court that none of the 27 acres is owned by the State, and that all of it is owned by Mr. and Mrs. Blasky.

V. CONCLUSION.
While there were other issues raised by Brevard County and the District, including an argument that the statute of limitation on asserting inverse condemnation had run, we deem them without substantial merit and unnecessary to discuss. As no error has been demonstrated, we affirm the Order of Taking rendered in this case.
AFFIRMED.
PETERSON and THOMPSON, JJ., concur.
NOTES
[1] The trial court found it curious that Brevard County accepted taxes from Mr. and Mrs. Blasky and their predecessors on the entirety of the 27 acres during all of the years preceding this dispute, but now assert that a significant part of the land actually belonged to the State.