965 So.2d 276 (2007)
Alfred J. TREPANIER, etc. et al., Appellants,
v.
COUNTY OF VOLUSIA, Florida, Appellee.
No. 5D05-3892.
District Court of Appeal of Florida, Fifth District.
September 14, 2007.
*278 Kurt H. Garber, of Wilson, Garber & Small, P.A., Orlando, Steven G. Gieseler and Valerie A. Fernandez, of Pacific Legal Foundation, Stuart, for Appellants.
Daniel D. Eckert, County Attorney, and Jamie Ellen Seaman, Deputy County Attorney, DeLand, for Appellee.
GRIFFIN, J.
Alfred J. Trepanier, Louis Celenza, and Zsuzsanna Celenza ["Appellants"] appeal the trial court's order denying them partial summary judgment and granting Volusia County ["County"] summary final judgment in a case concerning public use of beachfront property. We affirm in part and reverse in part.
Appellants hold record title to platted lots of beachfront property that run adjacent to the Atlantic Ocean in New Smyrna Beach, Volusia County, Florida. The Celenzas also own a thirty foot strip designated as reserved for a boardwalk on the original plat. As reflected on the recorded subdivision plat, a portion of Appellants' lots extend seaward of the established seawall line and onto the sandy beach. As a result of hurricanes occurring in 1999 and 2004, the part of the shore adjoining Appellants' property suffered severe erosion.[1] Due to this erosion, public use of the beach and the County's regulation of that public use shifted inland and onto that portion of Appellants' lots lying seaward of their seawall for a distance of approximately forty feet. Appellants complain that the County has set up public driving lanes and parking on a portion of the beach owned by Appellants.
To ensure that endangered sea turtles are not harmed by vehicular traffic, the *279 County creates a thirty-foot Habitat Conservation Zone (HCZ) within which vehicles are prohibited. The HCZ usually begins at the toe of the dunes and extends seaward. The county demarcates the eastern boundary of the conservation zone with four-by-four teal colored posts.[2] The posts are re-aligned annually to take into account erosion and expansion of the dune formations. Cars are prohibited from proceeding into the HCZ. Where the County sets up the traffic lanes and parking areas on the beach varies, depending on conditions.
According to Appellants, natural sand dunes and vegetation once covered a substantial portion of their beach property, seaward of their seawall. Before 1999, the HCZ posts were just seaward of their platted lots and the vehicles and parking were, correspondingly, outside their platted lots. In 1999, Hurricanes Floyd and Irene hit Florida's east coast, causing severe erosion to the part of the beach where Appellants' property is located. The dunes and natural vegetation on Appellants' property were largely destroyed. The County subsequently reinstalled the HCZ posts substantially landward onto Appellants platted lots. Once this was done, vehicles began driving and parking on Appellants' property up to the posts marking the HCZ. The 2004 hurricanes resulted in substantial further erosion, which caused the posts and the traffic to shift even further landward.[3]
In Appellants' Third Amended Complaint against the County, Appellants alleged that the County improperly used their property for traffic and parking, even though no easement or other property interest would authorize such use. Based on these allegations, Appellants made three claims. In Count I, Appellants brought an inverse condemnation action against the County, based on the County's appropriation of their property for parking and driving lanes. In Count II, Appellants brought an action for trespass against the County, based on their maintenance of the parking and driving lanes, in which they sought an injunction to prevent such future activity, and monetary damages.[4] In Count III, Appellants made a second inverse condemnation claim, based on the County's installation of the HCZ posts on Appellants' property. Finally, Appellants requested declaratory relief establishing Appellants' right to exclude the public's use of their property for vehicular traffic and parking, and injunctive relief prohibiting the public from using Appellants' property for such purposes.
In its Answer, the County set out several defenses. The County claimed that the public had the right to drive and park on the portion of the beach claimed by Appellants by dedication, custom, or prescription. The County also asserted that the trespass action was barred by the statute of limitations[5] and that Appellants' "trespass *280 claim is barred by the doctrine of sovereign immunity because [they] failed to comply with the notice requirements pursuant to Section 768.28(6)(a)."
Further, in their Answer, the County asserted two counterclaims. In its first counterclaim, the County asked the court to recognize and impress a public easement on Appellants' land, up to the seawall or line of permanent vegetation, for ingress, egress, recreational and other customary uses. The County sought an injunction from Appellants' purpresture[6] which would interfere with, impair or impede the public's exercise and enjoyment of its rights of access. In its second claim, the County asked the court to declare that it held in trust for the public, title to the thirty-foot strip of beach known as the "Boardwalk," and that the Celenzas had no interest in this property.[7]
Appellants do not dispute the public's right to use their property seaward of the seawalls for such customary uses as bathing, swimming and general recreation, but they do object to the public driving and parking. They say that parking and driving is an inferior use of the beach, and that such activity has not been established as a custom on Appellants' particular portion of the beach under the standard laid out in City of Daytona Beach v. Tona-Rama, Inc., 294 So.2d 73 (Fla.1974). Further, Appellants contend that the elements to acquire a prescriptive easement to Appellants' property or to establish a dedication were not met by proof.
In its order, the trial court denied Appellants' motion for partial summary judgment on the County's counterclaim and entered an order of summary final judgment in favor of the County. The court said:
This court declares that the defendant, COUNTY OF VOLUSIA, on behalf of the public, holds a superior claim to possession and use of the beach landward of the mean low water mark of the Atlantic Ocean to the place where there is marked change in material or physiographic form, or to the line of permanent vegetation in accordance with the definition set forth in Fla. Stat. section 161.54(3) (2004). Plaintiffs are permanently enjoined from impeding public access to the beach or from acting in any manner inconsistent with the free use of the beach by the public, including access by motor vehicle, subject to the regulatory power of the County of Volusia.
The trial court's order in this case is lengthy and understandably complex. To begin with, the trial court found the facts as presented by the County in its Motion for Summary Judgment to be uncontested and incorporated these pages from the County's motion into its order. The trial court then divided its legal analysis into essentially nine parts.
The trial court principally concluded that the right of the public to access and use the beaches of Florida is protected by Florida's public trust doctrine. The trial court explained that although land held in trust for the people under this doctrine, as *281 set forth in Article 10, section 11 of the Florida Constitution, is the expanse of beach below the mean high water line, the public has a right to use and access the beach up to the seawall or line of permanent vegetation in all of Volusia County, by "custom," "prescription," and "dedication."
Second, the trial court noted that, under Tona-Rama, the public may obtain a superior right to use private property upland of the mean high tide line by custom when the recreational use of that area has been "ancient, reasonable, without interruption, free from dispute." Tona-Rama, 294 So.2d at 74. The order then relied on the trial court's opinion in County of Volusia v. Reynolds, Seventh Circuit Court Case No. 92-32184 CICI, affirmed, 659 So.2d 1186 (Fla. 5th DCA 1995), for the proposition that, as a matter of law, the public has a customary right of access and general recreational use of the beach in all of Volusia County and that vehicle use is included within the ambit of that customary use.
In support of these assertions, the trial court said that "the sandy beaches adjacent to plaintiff's property have formed the way for automobiles over many years passing from the street along the beach up to the inlet." Notably, the court does not cite evidence that the part of the sandy beach included within Appellants' platted lots have been historically traversed by automobile traffic. However, the court concluded that Appellants cannot show any "tear in the whole cloth of public rights of access and motor vehicle use on and over their property." In coming to this conclusion, the trial court did not address the language in Tona-Rama,[8] this court's opinion in Reynolds,[9] and the Volusia County Beach Code[10] suggesting that custom is subject to individual proof.
In the third part of its analysis, the court recognized that dedication is another method by which the public can gain rights to private property. The court cited Bonifay v. Dickson, 459 So.2d 1089, 1093 (Fla. 1st DCA 1984), for the proposition that common law dedication requires "an intention to dedicate the property for use of the *282 public, acceptance by the public, and clear and unequivocal proof of these facts." The court then concluded that the public obtained a right to use of the Boardwalk and ocean beach by dedication:
In the instant case the plat and actions of the dedicator indicate intent to dedicate the boardwalk and the Atlantic Ocean Beach to the public. The dedication was contemporaneously accepted by the public and use has continued to date. These facts are clearly and unequivocally proved by sworn testimony, the language of the plat and historical documents. The public retains its rights under the dedication even if the underlying fee is transferred.
In stating its conclusion, the court did not specify whether it found an intent to dedicate the beach only landward up to and including the Boardwalk or beyond the Boardwalk into the platted lots. Appellants have confined the scope of their lawsuit to their platted lots.
In its fourth point, the court stated that the public established a prescriptive right to use Appellants' property. The order stated:
The public has made actual, continuous, uninterrupted use of the entire sandy beach as a thoroughfare for vehicles since the turn of the twentieth century. . . . Vehicular access and use of the beach was open, notorious and visible and within the knowledge of all beach-front property owners. Since this alleged `adverse' use has been continued for almost one hundred years, the public has acquired a prescriptive use for vehicles to use the sandy beaches as a thoroughfare.
The court did not explain how the historic use of the beach for vehicular traffic was adverse or inconsistent with Appellants' use and enjoyment of their land during the prescriptive period. Also, the court failed to find that the historic beach traffic continuously and actually traversed the part of the beach that includes Appellants' platted lots.[11]
In the fifth part of its analysis, the trial court found that any right the public may have had in the portions of the beach seaward of Appellants' platted lots migrated landward with the mean high water line. For this proposition, the trial court relied primarily on the decision of the Second District Court of Appeal in Feig v. Graves, 100 So.2d 192 (Fla. 2d DCA 1958). Accepting the notion that fixed boundaries do not apply to waterfront property, the order reasoned:
The easterly lot lines erode as the sovereign land shifts landward and, in between the moving boundary of the sovereign tideland (or foreshore) and the plaintiffs' lots, the public right also shifts with the tide.
. . . .
The area of public use cannot be bounded with reference to a static line since the beach, and hence the public's use of it, fluctuates landward and seaward over time. The public right, if it is to reflect the reality of the public's actual use of the beach, must migrate. The law cannot freeze such a right at one place any *283 more than the law can freeze the beach itself.
The trial court, however, omitted any mention of the rule that boundaries do not shift when the loss of land occurs suddenly by avulsion[12] rather than gradually through erosion. See, e.g., Siesta Props., Inc. v. Hart, 122 So.2d 218 (Fla. 2d DCA 1960).
In its sixth point, the court cited Fallini v. United States, 56 F.3d 1378 (Fed.Cir. 1995), and writes that "[t]o state a `takings claim,' a claimant must `demonstrate ownership or title' and an economic expectancy `at the time of taking.'" The trial court then reasoned that, since Appellants' property was subject to public use, and Appellants were on notice that their property might be subject to such use when they purchased the property, they cannot state a takings claim. ("Since a property right must exist before it is taken, plaintiffs have lost nothing and the Beach Code has not burdened their property interest for the common good.").
The court's seventh point appears to be that the trespass claim has no merit because the public had the right to be on the property and the county had the right to regulate such use under Tona-Rama. Alternatively, the court said that, even if there was a trespass, it began when the public first began driving on the beach or when the County began regulating such use.
The trial court's eighth point found that a precedent was established when the trial judge decided in the Reynolds case that, as a matter of law, the public had a customary right to use the beaches of Volusia County to the line of permanent vegetation or seawall, whichever is more landward, which precedent he would follow.
In its ninth and final point, the trial court's order said that Appellants' trespass claim was "barred by doctrine of sovereign immunity because [Appellants] failed to comply with the notice requirements" under section 768.28(6)(a), Florida Statutes, because they did not "give written notice of the claim to the County and the State Department of Insurance within three years after the cause of action accrued."
Appellants contend on appeal that material issues of fact precluded the entry of summary final judgment in favor of the County because it was in dispute whether the elements of dedication, prescription, and custom were satisfied with respect to Appellants' lots or, as to custom, the location of the permissive use, if any. The County does not appear to contend that the facts that Appellants claim are in dispute are undisputed, rather, their argument appears to be that the issues of fact raised by Appellants are immaterial.
The County constructs its argument by first defining the beach to include the wet and dry sand between the mean high water mark and the seawall or line of permanent vegetation.[13] Then, based primarily on Tona-Rama, the County asserts that "the public has a superior right of access to and use of `the beach,' regardless of ownership of the underlying fee." The County posits that the public's right to use of the beach necessarily includes driving and parking. Finally, the County contends that this public right migrates with the changes in the coastline. If the public has a right of use seaward of private property and that beach disappears, the right *284 of public use migrates landward onto private property.

SOURCES OF THE PUBLIC'S RIGHT OF USE OF THE BEACH.
The common law public trust doctrine is embodied in Article 10, section 11 of the Florida Constitution. Under that provision, title to the portion of the beach below the mean high water line is held by the state in trust for all the people. The "beach," however, includes more land than what is set aside for the people under the public trust doctrine. The area above the mean high water line is subject to private ownership. § 177.28(1), Fla. Stat. (2005). See also Clement v. Watson, 63 Fla. 109, 58 So. 25, 26 (1912). In Florida, courts have recognized that the public may acquire rights to the dry sand areas of privately owned portions of the beach through the alternative methods of prescription, dedication, and custom. S. Brent Spain, Florida Beach Access: Nothing but Wet Sand?, 15 J. Land Use & Envtl. L. 167, 171-172 (1999).[14]

A. PRESCRIPTIVE EASEMENT

One means by which the public may acquire rights to private lands is by prescription. Tona-Rama, 294 So.2d at 75. For the public to gain a prescriptive easement in land, its use of private land must be continuous, for the statutory period of twenty years, actual, adverse under a claim of right, and either known to the owner or so open, notorious, and visible that knowledge of the adverse use by the public can be imputed to the owner. Downing, 100 So.2d at 64. Further, "[i]f the use of an alleged easement is not exclusive and not inconsistent with the rights of the owner of the land to its use and enjoyment, it would be presumed that such use is permissive rather than adverse." Tona-Rama, 294 So.2d at 76. The burden is on the claimant to prove that the public's use was adverse. Id. Moreover, in Downing v. Bird, 100 So.2d 57 (Fla.1958), the court said:
Also, `* * * the limits, location, and extent of his occupation must be definitely and clearly established by affirmative proof, and cannot be established or extended by presumption * * *' And the pleadings, as well as the proof, particularly where a prescriptive way is claimed, must show a reasonably certain line, by definite route and termini.
Acquisition of rights by one in the lands of another, based on possession or use, is not favored in the law and the acquisition of such rights will be restricted. Any doubts as to the creation of the right must be resolved in favor of the owner.
100 So.2d at 64-65 (citations omitted). Appellants assert that the facts underlying the court's prescriptive easement determination are in dispute. They argue:
One of the County's facts, adopted by the court, states: `Vehicles have continuously traversed the beach in all of Volusia County, including the beach that is the subject of this complaint, since the beginning of the 20th century. . . . The current location of vehicular use has not changed since the development of [the subdivision].' . . . Yet the owners alleged in their pleadings that the County frequently has moved its traffic lanes, including the crucial route alterations after the 1999 and 2004 hurricanes.
Further, Appellants' affidavit stated that, before 1999, extensive dunes covered their property seaward of the seawall line and where the County now allows driving. From the record, it is disputed  indeed it appears unlikely  that the public was continuously *285 driving on the part of the beach at issue prior to 1999, or that the public's use was adverse. See Tona-Rama. We conclude that genuine issues of material fact precluded the trial court's judgment in favor of the County on the theory of prescription.

B. DEDICATION

An affidavit from Attorney William E. Loucks addressed the issue of the parties' interest in the platted lots. He attested that he prepared a deraignment of title as to Lots 1, 2, 3, and 6 of Block 5, per the Resubdivision of the "Boardwalk" plat recorded in Map Book 8 page 114 of the Public Records of Volusia County, Florida. He concluded that Appellants were indeed the record title holders of these lots and that no part of the platted lots located between the seawall line and the Boardwalk area has ever been held by the County or any government entity or unit subsequent to December 22, 1970. Further, Attorney Loucks affirmed that he:
[f]ound no document recorded in the public records of Volusia County and contained within the Abstract that provided information or evidence that any title holder or owner of any portion of the lands constituting one or more of the Lots dedicated [Lots 1, 2, 3, or 6 of Block 5] to the public for use as a roadway or parking area for vehicles of any nature or description.
The public may acquire a right to use upland property by dedication. The dispositive issue in determining whether or not property has been dedicated appears to be whether the private property owner has expressed "a present intention to appropriate his lands to public use." City of Palmetto v. Katsch, 86 Fla. 506, 98 So. 352 (1923). In Katsch, the court said:
The means generally exercised to express one's purpose or intention to dedicate his lands to the public use are by a(1) written instrument executed for that purpose; (2) filing a plat or map of one's property designating thereon streets, alleys, parks, etc., (3) platting one's lands and selling lots and blocks pursuant to said plat indicating thereon places for parks, streets, public grounds, etc., (4) recitals in a deed by which the rights of the public are recognized; (5) oral declarations followed by acts consistent therewith; (6) affirmative acts of the owner with reference to his property such as throwing it open in a town, fencing and designating streets thereon; (7) acquiescence of the owner in the use of his property by the public for public purposes.
Id. at 511-12, 98 So. 352.
As explained by the Fourth District Court of Appeal in Hollywood, Inc. v. Zinkil, 403 So.2d 528, 533 (Fla. 4th DCA 1981):
[M]ere uses by the public although long continued, should be regarded as a license only, revocable at the pleasure of the owner, where it does not appear that any public or private interests have been acquired upon the faith of the supposed dedication, which would be materially impaired if the dedication were revoked.
The burden is on the government to prove dedication. City of Miami Beach v. Miami Beach Improv. Co., 153 Fla. 107, 14 So.2d 172, 176 (1943). This court added in Brevard County v. Blasky, 875 So.2d 6, 11 (Fla. 5th DCA 2004), that the "proof required of the intention to dedicate is `clear and unequivocal,' and the burden of proof is on the party asserting the existence of the dedication."
On appeal, Appellants contend that the trial court erred in finding that the "public had a right to drive on the owners' property because the property had been dedicated to the public prior to the owners' assumption of ownership." According to *286 Appellants, "a plain review of the plat by which" Appellants gained "title to their properties showed that there was no such dedication." In support of their argument, Appellants' cite to Attorney Loucks' affidavit. They argue that there is simply no evidence of any historical intent to dedicate any portion of Appellants' platted lots, and they point out that they have always been assessed by the County  and have always paid the taxes for their platted lots.
The County's argument with respect to dedication is that the intent to dedicate the sandy portion of the beach is clear because:
In both the Miller plat and Coronado Beach Company replat, the sandy beach is separated from the upland lots by a boardwalk. The sand is dedicated as `Atlantic Ocean Beach.' These unequivocal, unambiguous words manifest the intent to dedicate the sandy beach for public use. As well as the Crawford Road vehicle approach providing public access on the south, additional public access is provided by a thirty-foot wide access across the dune to the beach on the north of the plat.
We agree with Appellants that there is no indication in the plats that the developer intended a dedication of any portion of the owner's platted lots or the Boardwalk. In the Coronado Beach Company (1929) replat, which is the plat from which Appellants deraign title, the following language appears:
The Coronado Beach Land Company, a corporation of Ohio, of which L.B. Miller is President and Louise Ford is secretary, being the owner of "The Boardwalk" Subdivision in Coronado Beach, Volusia County, Florida, and having caused a survey and subdivision thereof to be made according to the attached map, by and with the authority of its Board of Directors, hereby dedicates the boulevards, avenues, streets, roads and drives to the public use.

(Emphasis added). This is the only dedication. The plat does not provide the "clear and unequivocal" proof that the dedicator intended to dedicate the Boardwalk area to the public. See Blasky, 875 So.2d at 11. Thus, the trial court erred in finding that the public had a right to use Appellants' private property on the grounds that their platted lots were dedicated.

C. CUSTOM

If the public has a right to drive and park on appellant's privately owned platted lots, it most likely will be through application of the law of "custom." Florida's Supreme Court first recognized the public's "customary" right to the use of Florida's privately-owned dry sand beaches in the Tona-Rama decision. 294 So.2d at 74. There the court said:
The beaches of Florida are of such a character as to use and potential development as to require separate consideration from other lands with respect to the elements and consequences of title. The sandy portion of the beaches . . . [have] served as a thoroughfare and haven for fishermen and bathers, as well as a place of recreation for the public. The interest and rights of the public to the full use of the beaches should be protected.
294 So.2d at 77. The court recognized that the public may acquire a right to use the sandy area adjacent to the mean high tide line by custom when "the recreational use of the sandy area . . . has been ancient, reasonable, without interruption and free from dispute. . . ." Id. at 78. The recognition of a right through "custom" means that the owner cannot use his property in a way that is inconsistent with the *287 public's customary use or "calculated to interfere with the exercise of the right of the public to enjoy the dry sand area as a recreational adjunct of the wet sand or foreshore area." Id.
This appeal requires us to confront several issues relating to the law of "custom" applied to Florida's beaches that have not directly been confronted before. Among these are: Did Tona-Rama announce, as a matter of law, a right by "custom" for the public to use the entire dry sand beach of the entire coast of Florida? If so, does that right include the right to drive and park on the beach? If Tona-Rama did not establish a "customary" right, as a matter of law, how is the right established in an individual case such as this one?

1. Was the public's right to use appellants' private property FOR RECREATION ESTABLISHED IN TONA-RAMA?

In Tona-Rama, the court wrote, "[t]he general public may continue to use the dry sandy area for their usual recreational activities, not because the public has any interest in the land itself, but because of a right gained through custom to use this particular area of the beach as they have without dispute and without interruption for many years." Tona-Rama, 294 So.2d at 78 (emphasis added). It is not clear what the Tona-Rama court meant by the phrase, "this particular area of the beach." It may refer to the area around the tower and pier at issue in that case, or it may refer to the "dry sandy" part of the beach generally, or even something else.
Although we recognize that the issue is far from clear, we conclude, both from our reading of the supreme court's various opinions in Tona-Rama and from reading the underlying decision of the First District Court of Appeal in City of Daytona Beach v. Tona-Rama, Inc., 271 So.2d 765 (Fla. 1st DCA 1972), that the intent of the supreme court was to declare the right of customary use in the public only for the area of beach at issue in that case, for which it had an extensive factual record of customary public use. Indeed, the decision of the First District Court of Appeal was explicit in this regard, as it necessarily had to be, because the remedy that court embraced was prescriptive easement. The opinion of the First District sets forth the following:
A fair and objective consideration of all the evidence before the trial court establishes the following undisputed facts. For more than twenty years prior to the institution of this action, the general public visiting the ocean beach area had actually, continuously, and uninterruptedly used and enjoyed the soft sand area of the beach involved in this proceeding as a thoroughfare, for sunbathing, for picnicking, frolicking, running of dune buggies, parking, and generally as a recreation area and a playground. . . . The City of Daytona Beach has constantly policed the area for the purpose of keeping it clear of trash and rubbish and for preserving order among the users of the beach; has controlled automobile traffic using the hard sand area of the beach and enforced a prohibition against parking by vehicles on the area in question; and has otherwise exercised the police power of the City over the area for the convenience, comfort and general welfare of persons using and enjoying the beach area.
Id. at 766.
In its Tona-Rama opinion, the supreme court carefully identified the parcel in question and its description of the "general recreational use by the public" that was "without dispute" and "without interruption for many years" is suggestive. As the decision of the First District demonstrates, the only evidence of undisputed, uninterrupted use was the area of beach in proximity *288 to the tower within the City of Daytona Beach. Based on our reading of Tona-Rama, we do not believe that the supreme court intended to announce a right by custom for public use of the entire sandy beach area of the entire State of Florida.[15]
This Court previously addressed this issue in dicta in Reynolds, 659 So.2d at 1186. In Reynolds, the owners owned lots facing the beach, and traced title to a C.F. Austin. The plat that Austin recorded in 1889 indicated that "Wagon Road" separated the owners' lots from the beach and the sea. In the space on the plat indicating that portion of the beach between Wagon Road and the sea was the following writing: "BEACH STREET," "300 to 400 feet wide," "All of the Beach from the East foot of the sand dunes to the low water mark is hereby dedicated to the public for a highway." Id. at 1188-89. In 1980 and 1983 the City abandoned or vacated both Wagon Road and Beach Street.
The County filed a declaratory judgment suit against the owners to clarify their power to regulate and control the area of the sandy beach east of the property owners' lots and the "the permanent vegetation line, which runs along the dunes," and west of the mean high water tide line of the Atlantic Ocean. Reynolds, 659 So.2d at 1187. One argument raised by the County was that "the public had acquired customary rights to use the sandy beach area for driving, parking and recreation stemming from `ancient' and constant usage by the general public." Id. at 1187-88. This Court held that a "custom" giving the public a right of access to the disputed land was not an issue in the case, because the lot owners never obtained a fee interest in the beach area. Id. at 1189, 1191. Rather, this Court held that the beach area had been dedicated in the Austin plat and thus had been placed "permanently in the public domain." Id. at 1189. However, in its conclusion this Court said:
In summary, although the doctrine of customary usage of the sandy beach areas of this state, as annunciated in City of Daytona Beach v. Tona-Rama, Inc., *289 294 So.2d 73 (Fla.1974), offers a potential additional ground to support the trial court's ruling, we do not rely on it. That doctrine requires the courts to ascertain in each case the degree of customary and ancient use the beach has been subjected to and, in addition, to balance whether the proposed use of the land by the fee owners will interfere with such use enjoyed by the public in the past. If there is no private fee owner of the sandy beach area involved in the case, that doctrine has no application.
Id. at 1190-91 (emphasis added).
Appellants assert that, under the test that the Florida supreme court laid out in Tona-Rama, several issues of fact must be resolved before a determination can be made as to whether or not the public has a right to drive and park on Appellants' property based on "custom." Among the questions posed in evaluating a claim of right by "custom" are whether a use is ancient, reasonable, without interruption and free from dispute. Appellants urge that each of the test's components requires facts specific to a given use and to a given property.

2. HOW IS A "CUSTOMARY RIGHT" ESTABLISHED?

What evidence is required in order to establish entitlement of the public to use of a particular parcel, based on custom?[16] Logically, the place to begin would be with an understanding of how rights are acquired on a theory of "custom" and how, historically, such rights have been legally established. For this purpose, we have been greatly aided by David J. Bederman's fine article, "The Curious Resurrection of Custom; Beach Access and Judicial Takings," published in 1996 in the Columbia Law Review.[17] In that article, Bederman explains that, at common law, establishment of a right through custom required proof of several elements. Id. at 1385. In addition to the temporal requirement of "ancient" use, three other key elements must be proven: peaceableness, certainty and consistency. Finally, the customary use must be shown to be "reasonable." While some may find it preferable that proof of these elements of custom be established for the entire state by judicial fiat in order to protect the right of public access to Florida's beaches, it appears to us that the acquisition of a right to use private property by custom is intensely local and anything but theoretical.[18] "Custom" is inherently a source of law that emanates from long-term, open, obvious and widely-accepted and widely-exercised practice. It is accordingly impossible precisely to define the geographic area of the beach for which evidence of a specific customary use must be shown, because it will depend on the particular geography and the particular custom at issue.
The specific customary use of the beach in any particular area may vary, but proof is required to establish the elements of a customary right. See Bederman, supra, at 1449. If the only source of a right claimed as "custom," is that a certain thing has been done in a certain way in a certain place for so long that no one can remember when it wasn't done that way, the *290 inability to offer evidence of the custom suggests the weakness of the claim.
In this Court's opinion in Reynolds, we interpreted Tona-Rama to require the courts to "ascertain in each case the degree of customary and ancient use the beach has been subjected to and, in addition, to balance whether the proposed use of the land by the fee owners will interfere with such use enjoyed by the public in the past."[19]Reynolds, 659 So.2d at 1191. Also, as was noted in Tona-Rama, some or all of the customary uses by the public may be shown to have been abandoned. We note that the County requested the trial court to take judicial notice of Section 20-82 of the Volusia County Code of Ordinances, the Beach Code, which includes the following language:
It is not the intent of the Charter or of this chapter to affect in any way the title of the owner of land adjacent to the Atlantic Ocean, or to impair the right of any such owner to contest the existence of the customary right of the public to access and use any particular area of privately owned beach, or to reduce or limit any rights of public access or use that may exist or arise other than as customary rights.
(Emphasis added). We think this language cogently describes the test: Does evidence establish the existence of the public's right to access and use a particular area of privately owned beach?
To establish a customary right, we do not suggest that the County must prove that cars, horses, or other modes of transportation have customarily traversed and parked on Appellants' specific parcels of property. Rather, we read Tona-Rama to require proof that the general area of the beach where Appellants' property is located has customarily been put to such use and that the extent of such customary use on private property is consistent with the public's claim of right.
The County takes the position that the right to drive vehicles onto the beach inherently falls within the public's customary right to use and access the beach. It writes, "[v]ehicles may not be restricted seaward of the mean high water mark any more than the people and their towels." Vehicles or the access they provide are "imperative" to enjoying the beach. On the face of it, this argument is circular because if it is true, it must be so by custom. There are many beaches in Florida where parking and driving are not allowed. Appellants urge that driving and parking on the beach are not properly a customary right because the practice of driving and parking on the beach is not ancient or reasonable and because there is no evidence that driving or parking was ever a public use made of the area of beach where Appellants' property is located. We agree that it is not enough to show that driving and parking are a customary use of some of the County's beach; it must be shown that driving and parking are a customary use of this part of this area of the beach. This could be established by proof that driving and parking are an ancient, peaceable, certain, constant and reasonable use of the entire coast contained within Volusia County, but that proof has not been made. According to the record, there are parts of the beach in Volusia County where driving and parking are not allowed at all or during certain periods. Also, the record suggests that *291 the County may have abandoned driving and parking on some parts of the beach in order to preserve them in others.
In Tona-Rama, the court said that the public may acquire a right to use the sandy area adjacent to the mean high tide line by custom when "the recreational use of the sandy area . . . has been ancient, reasonable, without interruption and free from dispute. . . ." Id. at 78. Further, the court said that, although the public's customary rights "cannot be revoked by the land owner, it is subject to appropriate governmental regulation and may be abandoned by the public." Id. (emphasis added). Given this language in Tona-Rama, it does not appear that the fact that vehicular use may be regulated is necessarily relevant to a determination whether it is a customary use. Driving and parking on the beach may be considered an adjunct to the recreational use of the beach because it is the way to access the beach; it may be viewed as a customary use in its own right based on either a historic custom of using the beach as a thoroughfare; or it may itself be deemed a recreation.[20] If the former, it seems that whether or not driving and parking on the beach fall within the ambit of customary rights is related to the availability of historic alternative access. Otherwise, the availability of alternative access is irrelevant.

3. WHETHER THE PUBLIC'S RIGHT OF USE IS AMBULATORY.

The affidavit from Appellant Louis Celenza addressed the extent of the activities that had been occurring within the four corners of his platted lots. He began by noting:
3. At the time I purchased this property back in 1997 a substantial portion of the beach area located on my property seaward of the seawall included natural sand dunes and vegetation. Vehicles and parking on the beach were located seaward of the dune and vegetation area outside of my platted lots. These dunes and vegetation extended approximately 90 feet from my seawall at the time I purchased my property in 1997.
He continued that, at the time he purchased his property, the HCZ posts were just seaward of his platted lots. His property was hit especially hard by hurricanes Floyd and Irene in 1999, and there was substantial erosion from these storms. All but about a 500 square foot "area of the dunes and vegetation located seaward of my seawall were wiped out." After the hurricanes, the County re-installed the HCZ posts substantially landward, encroaching onto his platted lots, within seventy feet or closer of his seawall. He attested that once the posts moved landward, vehicles began driving and parking just seaward of the posts on his property.
Further, Appellant Celenza attested that the 2004 hurricanes further devastated the beach area adjacent to his platted lots. According to his affidavit,
10. [T]hese hurricanes caused substantial beach erosion of the beach area on and adjacent to my property. All of the cz posts were removed and reinstalled on several occasions in between and immediately following the hurricanes. It is estimated that the beach area on my property lost approximately 6 feet of sand cover as a result of these hurricanes.
He stated that, after the hurricanes of 2004, the County re-installed the posts further *292 landward and closer to his seawall  approximately sixty feet seaward of the seawall.
Finally, Celenza observed:
13. The driving and parking of vehicles on the beach area on and adjacent to my property is not continuous. Since I have owned the property the County has closed the beach on numerous occasions for several months at a time. For example, the 2004 hurricanes resulted in the beach being closed to vehicles by the County for approximately four (4) months. To date, vehicles can only use the beach during low tide.
Special common law rules and the Florida Constitution govern the boundaries of waterfront property. § 177.28(2), Fla. Stat. (2005) ("No provision of this part shall be deemed to modify the common law of this state with respect to the legal effects of accretion, erosion, or avulsion."). In Siesta Properties, the Second District Court of Appeal explained the concepts or erosion, accretion, and avulsion. The issue in dispute was who held title to "a narrow strip of land that was, until the 1926 hurricane, a narrow body of water known as Little Sarasota Pass between Siesta Key and Casey Key." Siesta Props., 122 So.2d at 220; see Bryant v. Peppe, 238 So.2d 836, 837 (Fla.1970). In addressing this issue, the Second District Court of Appeal explained how title to property was affected by accretion, erosion and the distinguishable phenomenon of avulsion.
The rule we think should govern in such a situation is set forth in In re City of Buffalo, 206 N.Y. 319, 99 N.E. 850, 852, wherein it is stated: `When land bordering a body of water is increased by accretion  that is to say, by such a slow and gradual deposit of particles that its progress cannot be always measured even though its results may be discerned from time to time  the new land thus formed belongs to the upland to which it attaches. By the same reason the rule is that, when the sea, lake, or navigable stream gradually and imperceptibly encroaches upon the land, the loss falls upon the owner, and the land thus lost by erosion returns to the ownership of the state. This is not the rule where the loss of the land occurs by avulsion, defined as the sudden or violent action of the elements, the effect and extent of which is perceptible while it is in progress. In such cases the boundaries do not change.'
Siesta Props., 122 So.2d at 223-24.
The key to the County's position is: "Not only can title change because of the advances and retreats of the sea, but also the location and extent of easements or right of use along waterways move with changes in the tide." According to the County, "[t]he easterly lot lines erode as the sovereign land shifts landward and, in between the moving boundary of the sovereign tideland or foreshore and the [Appellants'] lots, the public right also shifts with the tide. If the daily ebb and flow of the sea affect ownership, the public's use must move with it . . . [otherwise] the boundary of the sovereign lands did not move, and the public would also be cut off from its right to access navigable water."
The County's argument presents some difficulties. There is no doubt that if the mean high water line moves onto private property, the right of the public up to the mean high water line does migrate because of the constitutional reservation of title to all land seaward of the mean high water line. However, the right to use privately-owned land based on custom is on an entirely different footing. First, reading the facts in the light most favorable to Appellants, it appears that avulsion, rather than erosion was the source of the loss of the dry sand beach where the public's undisputed customary right to recreational *293 use, including driving, has historically been exercised. If land is lost by avulsion, boundaries do not change. See Siesta Props. Certainly, if it can be shown that, by custom, use of the beach by the public as a thoroughfare has moved seaward and landward onto Appellant's property with the movement of the mean high water line, that public right is inviolate. However, it is not evident, if customary use of a beach is made impossible by the landward shift of the mean high water line, that the areas subject to the public right by custom would move landward with it to preserve public use on private property that previously was not subject to the public's customary right of use.
The case that has most directly confronted the question of migration of an easement by custom is Matcha v. Mattox, 711 S.W.2d 95, 100 (Tex.App.1986), where the court observed that "applying static real property concepts . . . would produce completely unworkable results if the beach continues to move." The Texas court appears to have reasoned that the "customary" public use "surely" moved landward and seaward over time, but this conclusion appears to not have been supported by evidence. Id. The court also seems to have made a policy judgment that the public's customary use of the beach will migrate landward onto private property because the public's right is a greater good. In our view, however, the migration of the public's customary use of the beach is a matter of proof.[21] We, accordingly, conclude that genuine issues of material fact do remain to be determined with regard to the theory of custom and reverse the summary judgment in favor of the County.
Finally, we agree with the trial court's analysis of the "takings" issue. If the law recognizes that the public has a customary right to drive and park on Appellants' property as an adjunct of its right to other recreational uses of that property, as recognized in Tona-Rama, then no takings claim can be made out.[22]
Accordingly, we affirm in part and reverse in part and remand for further proceedings consistent with this opinion.
AFFIRMED in part; REVERSED in part; REMANDED.
PALMER, C.J., and ORFINGER, J., concur.
NOTES
[1] According to a 2001 survey, the mean high water line runs twenty-seven feet to sixty-five feet seaward of the Boardwalk. The dunes and vegetation once extended ninety feet or more from the seawall, but major storms since 1999 have caused significant loss of beach.
[2] To allow beach driving and parking to continue within Volusia County, the County had to obtain an Incidental Take Permit from the U.S. Fish and Wildlife Service. Pursuant to this Incidental Take Permit and the Habitat Conservation Plan associated with it, the County is required to maintain posts marking the boundary of the HCZ on the beach year round.
[3] From the Celenza affidavits, it appears that the posts were 120 feet from their seawall in 1997. After the 1999 hurricanes, the County placed the posts approximately seventy feet from the Celenzas' seawall. After the 2004 hurricanes, the County placed the posts sixty feet from the Celenzas' seawall.
[4] We find no error in the trial court's disposition of this claim.
[5] The County contends that the statute of limitations for a trespass action is four years and that Appellants' action would have accrued whenever vehicles began driving on the portion of the beach platted as Appellants' property. Appellants correctly contend that the statute of limitations on their trespass claims had not expired when the suit was initially filed in May of 2000, because the actual physical invasion giving rise to those claims did not occur until 1999.
[6] BLACK'S LAW DICTIONARY 1250 (7th ed.1999), defines "purpresture" as "[a]n encroachment upon public rights and easements by appropriation to private use of that which belongs to the public."
[7] The "Boardwalk," never actually constructed but appearing on the subdivision plat, lies seaward of the Celenzas' platted lot.
[8] The court wrote, "[t]he general public may continue to use the dry sandy area for their usual recreational activities, not because the public has any interest in the land itself, but because of a right gained through custom to use this particular area of the beach as they have without dispute and without interruption for many years." Tona-Rama, 294 So.2d at 78 (emphasis added).
[9] In Reynolds, this court wrote that the customary use "doctrine requires the courts to ascertain in each case the degree of customary and ancient use the beach has been subjected to and, in addition, to balance whether the proposed use of the land by the fee owners will interfere with such use enjoyed by the public in the past." Reynolds, 659 So.2d at 1191.
[10] The court took judicial notice of Chapter 20 of the Volusia County Code of Ordinances. Chapter 20, section 82, contains the beach code and includes the following language:

The intent of section 205.1 of the Charter is to determine as a legislative fact binding on county government that since time immemorial the public has enjoyed access to the beach and has made recreational use of the beach; that such use has been ancient, reasonable, without interruption, and free from dispute; and that, because of this customary access and use, the public has the right of access to the beach and a right to use the beach for recreation and other customary purposes . . . It is not the intent of the Charter or of this chapter to affect in any way the title of the owner of land adjacent to the Atlantic Ocean, or to impair the right of any such owner to contest the existence of the customary right of the public to access and use any particular area of privately owned beach, or to reduce or limit any rights of public access or use that may exist or arise other than as customary rights.
(Emphasis added).
[11] Under Downing v. Bird, 100 So.2d 57 (Fla. 1958), the activity giving rise to the prescriptive easement must be both on the property of another and inconsistent with the owner's use and enjoyment of the land. Id. at 64. As explained by the court in Tona-Rama, "[i]f the use of an alleged easement is not exclusive and not inconsistent with the rights of the owner of the land to its use and enjoyment, it would be presumed that such use is permissive rather than adverse. Hence, such use will never ripen into easement." Tona-Rama, 294 So.2d at 76-77. The burden is on the claimant to prove that the public's use of the owner's property was adverse. Id. at 76.
[12] Black's Law Dictionary 132 (7th ed.1999) defines "avulsion" as: "1. A forcible detachment or separation. 2. A sudden removal of land caused by change in a river's course or flood."
[13] This definition is generally consistent with the definition of "beach" found in section 161.54(3), Florida Statutes (2005).
[14] See fn. 9, supra.
[15] Our conclusion that a single judicial declaration of the right of the public to use a particular beach through "custom" does not create a state-wide right is buttressed by a 1989 decision of the Oregon Supreme Court, McDonald v. Halvorson, 308 Or. 340, 780 P.2d 714 (1989). Use of the old English common law theory of "custom" to establish a public right to beach access had originally been announced by the Oregon court in State ex rel. Thornton v. Hay, 254 Or. 584, 462 P.2d 671 (1969). The Hay decision, which has been the subject of endless analysis and considerable criticism, was one of the authorities principally referenced by the supreme court in Tona-Rama.

The Oregon Supreme Court had occasion to revisit Hay in McDonald. The court was confronted with the sweeping language in Hay that had been so controversial: the suggestion that "ocean-front lands from the northern to the southern border of the state ought to be treated uniformly." 462 P.2d at 676. The McDonald court explained:
[N]othing in Hay fairly can be read to have established beyond dispute a public claim by virtue of "custom" to the right to recreational use of the entire Oregon coast, no matter what the topography of a particular place. Hay might make it clear that the doctrine of custom would apply to places "similarly situated," but it has to have been obvious to the court and the parties that not all areas of the coast necessarily were "similarly situated."
Id. at 724.
It is also worth noting that Justice Scalia, joined by Justice O'Connor, in the dissenting opinion to the high court's denial of certiorari in Stevens v. City of Cannon Beach, 510 U.S. 1207, 114 S.Ct. 1332, 127 L.Ed.2d 679 (1994), pointed out that the Hay court "misread Blackstone" in applying the law of custom to the entire coast of Oregon. Justice Scalia pointed out that a right by custom is confined to individuals of a particular description in a particular district. 114 S.Ct. at 1335, n. 5. See also Bederman at 1390-91.
[16] The County suggests that it is the Appellants, as the landowners, who have the burden to prove that the public's right, through custom, to use the dry sand beach and to drive upon it, do not burden their property. We cannot credit this argument and find no support for it in the authority they cite.
[17] 1996 Colum. L.Rev. 1375.
[18] See Stevens, 114 S.Ct. at 1335-36 (Scalia, J., dissenting).
[19] The County argues that the quoted language in Reynolds is dicta and that this Court's opinion in Reynolds left untouched the lower court's conclusion that the public had a customary right to use the beaches of Volusia County up to the line of permanent vegetation as a matter of law. However, that assertion is incorrect. This Court found that the trial court erred in applying the customary use doctrine in Reynolds because title to the disputed property was held in public rather than private hands.
[20] In Town of Ponce Inlet v. County of Volusia, No. 96-10202-CIDL-01 (Fla. 7th Cir.Ct.), Circuit Judge John Doyle, in denying an injunction that sought to reopen a part of the beach closed by the County, ruled: "There is no right to drive a motor vehicle on the beaches of Volusia County." He concluded that the public's limited right is connected to the public's right of access to the beach.
[21] We recognize that a question as important as the meaning and scope of Tona-Rama and the migration of the public's customary right to use of the beach will ultimately have to be determined by the Supreme Court of Florida, not this court. We believe, however, that this case should not go to the high court until the evidentiary issues we refer to have been developed in the trial court.
[22] In his dissent in Stevens v. City of Cannon Beach, Justice Scalia suggests that a takings claim is not foreclosed if the private land owner can establish that the state's post-hoc announcement of a customary right is "pretextual." 114 S.Ct. at 1334. Justice Scalia appears to be of the view that the Hay court in Oregon so completely failed to adhere to the required elements of the common law of custom that it essentially concocted a made-up law of "custom" whose purpose was to secure public access to private property without compensation. Although the Tona-Rama court cited to Hay, the Florida court recognized the requirements to establish a customary right to use private property, and with the possible exception of "ancient use"  an awkward concept in a new world society  the Tona-Rama court appears to have followed the common law rule. The Tona-Rama court relied on an extensive, fact-intensive record of the nature and extent of the public's customary use of a defined area of beach. Florida may, therefore, avoid the "pretext" problem if this issue arises again with the change in composition of the current United States Supreme Court.