[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11354

_____

D.C. Docket No. 8:19-cv-01473-JSM-SPF

SHAWN BUENDING,
ROBERT DOHMEN,
THOMAS BROWN,
HARRY S. FIELDS,
WENDY FIELDS,
SHAWN MOORE,
DAGMAR MOORE,

Plaintiffs - Appellees,

versus

TOWN OF REDINGTON BEACH, a Florida municipal corporation,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 20, 2021)

Before MARTIN, GRANT, and BRASHER, Circuit Judges.

MARTIN, Circuit Judge:

Florida is famous for its beaches. The Town of Redington Beach, located on a barrier island in the Gulf of Mexico, is no exception. Shawn Buending, Robert Dohmen, Thomas Brown, Harry S. Fields, Wendy Fields, Shawn Moore, and Dagmar Moore (the "Property Owners") own beachfront property in Redington Beach. They sued the Town after it passed an ordinance that granted the public certain access to the dry sand beaches.

This appeal requires us to decide whether the District Court properly granted summary judgment to the Property Owners on their claims that the ordinance violated Florida law and constituted an unlawful taking. It also requires us to decide whether the District Court erred in granting summary judgment to Ms. Fields, who argued the Town violated her First Amendment rights by removing her from the Town's Board of Adjustment after she filed this lawsuit.

After careful consideration, and with the benefit of oral argument, we vacate and remand the District Court's grant of summary judgment to the Property Owners on their claims that the ordinance violated Florida law and constituted an unlawful taking. We also vacate and remand the District Court's grant of summary judgment to Ms. Fields on the First Amendment retaliation claim.

## I.    BACKGROUND

A. Factual Background

The Town of Redington Beach is primarily a single-family residential community.  With a population of about 1,500 people, the Town has a total area of 1.3 square miles, 0.4 square miles of which is land and 0.9 square miles is water. See U.S. Census Bureau, Redington Beach Town, Florida, https://www.census.gov; Redington Beach Map and Weather, http://www.redingtonbeachflorida.org/Redington_Beach_Map_Weather.html (last visited Aug. 20, 2021).  Though the Town does not have tourist facilities or promote itself as a tourist destination, tourists do come, and stay at the Royal Orleans (a timeshare hotel) or in vacation rental units.  The Town maintains over 20 parking spaces for visitors.

The Property Owners own beachfront property within the Town. Specifically, Shawn Buending and Robert Dohmen, through real estate agent (and fellow Plaintiff) Wendy Fields, bought their home in 2018 for $8.35 million  Mr. Buending and Mr. Dohmen divide their time between their homes in Florida and Wisconsin.  Thomas Brown, who also maintains a home in Michigan, purchased his property in the Town in 2017, with the house still being constructed at the time of the suit.  Wendy and Harry Fields purchased their property in 2004 for $1.7

3

million.  Shawn and Dagmar Moore purchased their property in 2017 for $5.2

million and have listed it for sale for $6.5 million.

The Property Owners, of course, made these purchases against the backdrop

of state property law principles.  The Florida Constitution gives the public a right

of access along the beaches and shorelines of the state, below the "mean high water

line[]"—the area otherwise known as the wet sand beach.[1]  Fla. Const. art. X, § 11.

Thus, using the Florida Constitution as a starting point, the Property Owners'

properties would extend at most to the mean high tide line and encompass the dry

sand beach landward of that line.

In addition to Floridians' constitutional right to public access, Florida law

also recognizes customary use.  Customary use finds its origins in English common

law.  William Blackstone described the "unwritten laws of England," including the

"particular customs, or laws which affect only the inhabitants of particular

districts."  1 William Blackstone, Commentaries on the Laws of England *74.

This was reflected in court decisions recognizing that, for instance, the inhabitants

of a parish could place a maypole on another's property and dance around it, see

---

[1] The mean high water line is defined under Florida law as "the intersection of the tidal plane of mean high water with the shore."  Fla. Stat. § 177.27(15).  "Mean high water" is in turn defined as "the average height of the high waters over a 19-year period.  Fla. Stat. § 177.27(14) For shorter periods of observation, 'mean high water' means the average height of the high waters after corrections are applied to eliminate known variations and to reduce the result to the equivalent of a mean 19-year value."  Id.

Hall v. Nottingham, 1 Ex. D. 1 (Eng. 1875), and that parish inhabitants could play games and sports on another's property because of established custom, see Fitch v. Rawling, 2 H. Bl. 393, 126 Eng. Rep. 614 (C.P. 1795).  English common law has long recognized use of another's property based on longstanding customs.

The customary use at issue here is the public's access to the Town's dry sand beaches.  Florida law allows for localities to recognize the public's customary use of their beaches, with Florida courts invoking the English common law tradition of the doctrine.  As the Florida Supreme Court has summarized:

> In England, persons of a certain locality or of a certain class may have, by immemorial custom, a right to make use of land belonging to an individual.  Thus, there may be a custom for the inhabitants of a certain town to dance or play games on a particular piece of land belonging to an individual, or to go thereon in order to get water.  So there may be a custom for fishermen to dry nets on certain land, or for persons in a certain trade (victualers) to erect booths upon certain private land during a fair.  The custom, to be valid, must have continued from time immemorial, without interruption, and as of right; it must be certain as to the place, and as to the persons; and it must be certain and reasonable as to the subject matter or rights created.

City of Daytona Beach v. Tona-Rama, Inc., 294 So. 2d 73, 78 (Fla. 1974) (quotation marks omitted).

Florida courts have for decades recognized the customary use doctrine.  But in 2018, the Florida state legislature enacted new requirements that localities must meet to assert the customary use of their beaches.  See Fla. Stat. § 163.035.

Specifically, when it comes to customary use rules that are adopted after a certain date, § 163.035 requires that government entities seek a judicial declaration affirming customary recreational use of a beach. Fla. Stat. § 163.035(2). Section 163.035 also contains other provisions regulating the recognition of customary use.

The statute went into effect on July 1, 2018. See Fla. Stat. § 163.035. On June 6, 2018, just under a month before the statute's effective date, the Town enacted the ordinance at issue in this appeal, Ordinance No. 2018-03 (the "Ordinance"). The Ordinance created a new section of the Redington Beach Town Code to "recognize[] and protect[]" the public's "long-standing customary use of the dry sand areas of all the beaches in the [T]own for recreational purposes." Ord. No. 2018-03 § 1. Under the Ordinance, the public could use the dry sand beach in the Town—including such portions of the Property Owners' properties—for recreational use limited to: traversing the beach; sitting on the sand, in a beach chair, or on a beach towel or blanket; using a beach umbrella that is seven feet or fewer in diameter; sunbathing; picnicking; fishing; swimming or surfing off the beach; placement of surfing or fishing equipment for personal use; and building certain sand creations (as long as those sand creations did not interfere with sea turtles). Ord. No. 2018-03 § (1)(d). The Ordinance sets a 15-foot "buffer zone" around private property that spans "seaward from the toe of the dune or from any privately-owned permanent habitable structure that is located on, or adjacent to, the

6

dry sand areas of the beach." Ord. No. 2018-03 § (1)(c).  The Ordinance also prohibits the use of tobacco, tents, and the possession of animals on the beach. Ord. No. 2018-03 § (1)(e).  It further states that existing rules governing beach use remained in effect and violations are punishable as set forth in the Town's code. Ord. No. 2018-03 § (1)(f).

### B. Procedural History

In 2019, the Property Owners sued the Town, alleging the Ordinance violated § 163.035, and that the enactment and enforcement of the Ordinance amounted to a taking under the U.S. and Florida Constitutions.

After the lawsuit was filed, Ms. Fields, one of the Property Owners, was asked during a Town Commission meeting to resign from her position on the Board of Adjustment (which reviews requests for variances from the Town's zoning code), because she had filed this suit against the Town.  Ms. Fields offered her resignation orally but was instructed by the mayor to provide her resignation in writing.  After consulting with her lawyer, Ms. Fields refused to submit her resignation in writing.  At the Commission's next meeting, the Commissioners voted unanimously to remove Ms. Fields from the Board of Adjustment.  The Property Owners then amended the complaint to include Ms. Fields's claim for First Amendment retaliation.

The parties filed cross motions for summary judgment. The District Court granted judgment in favor of the Property Owners on all claims. The court held that the Ordinance was void under § 163.035. It also granted summary judgment to the Property Owners on the Town's customary use defense. And in light of its determination that the public did not have customary use rights over the dry beach area, the District Court found that the Ordinance constituted both a facial and an as-applied taking. Finally, the District Court found that the Town's decision to remove Ms. Fields from the Board of Adjustment violated the First Amendment.

The Town timely appealed.

## II.    STANDARD OF REVIEW

We review de novo a grant of summary judgment and review findings of fact for clear error. Smith v. Haynes & Haynes P.C., 940 F.3d 635, 642 (11th Cir. 2019). A court assessing motions for summary judgment must "resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor." Layton v. DHL Express (USA), Inc., 686 F.3d 1172, 1175 (11th Cir. 2012). A court "may not weigh conflicting evidence or make credibility determinations of [its] own. If the record presents disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012) (quotation marks omitted).

8

## III.    DISCUSSION

A. The District Court erred in declaring the Ordinance void under Florida Statute § 163.035.

We first address whether the Ordinance violates § 163.035.  When, as here, the statute is unambiguous, we look to the plain language of the text.  Daniels v. Fla. Dep't of Health, 898 So. 2d 61, 64 (Fla. 2005); see also Robbins v. Garrison Prop. & Cas. Ins. Co., 809 F.3d 583, 586 (11th Cir. 2015).

In finding that the Ordinance violated § 163.035, the District Court looked to subsection 2, which states:

> **(2) Ordinances and rules relating to customary use.--**A governmental entity may not adopt or keep in effect an ordinance or rule that finds, determines, relies on, or is based upon customary use of any portion of a beach above the mean high-water line, as defined in s. 177.27, unless such ordinance or rule is based on a judicial declaration affirming recreational customary use on such beach.

Fla. Stat. § 163.035(2) (emphases added).

The District Court found that the Ordinance violated § 163.035 because it reasoned that the Town violated the "kept in effect" portion of the statute.  The court found that the Town kept the Ordinance in effect after July 1, 2018, when § 163.035 went into effect, and did so without seeking a judicial declaration affirming customary use.  The Town rejects this reading of § 163.035, arguing that the Property Owners' interpretation of the statute conflicts with § 163.035(4),

9

which allows for ordinances adopted before July 1, 2018 to be kept in effect and

defended in court.  Section 163.035(4) reads:

> **(4) Applicability.**--This section does not apply to a governmental entity with an ordinance or rule that was adopted and in effect on or before January 1, 2016, and does not deprive a governmental entity from raising customary use as an affirmative defense in any proceeding challenging an ordinance or rule adopted before July 1, 2018.

Fla. Stat. § 163.035(4) (emphasis added).

The Property Owners in turn respond that § 163.035(4) cannot serve as a

valid basis for the Town to keep the Ordinance in effect because, they say, the

Florida legislature intended for § 163.035(4) to apply only to localities' defense of

takings suits.  Upon our review, we conclude that this argument fails.  For one, the

Property Owners provide mere assertions of legislative intent and have not

provided any evidence in support of its claims.  But more to the point, the Property

Owners' view that § 163.035(4) is limited to suits against government takings

contravenes a plain reading of the statutory text.  Section 163.035(4) states that a

locality may raise an affirmative defense of customary use "in any proceeding."

Fla. Stat. § 163.035(4) (emphasis added).  We understand "any proceeding" to

mean any proceeding, including this one brought by the Property Owners here.

We therefore decline to adopt the Property Owners' reading.  See Daniels, 898 So.

2d at 64.

10

Instead, we conclude that the Town was entitled to invoke customary use as an affirmative defense under § 163.035(4).  Again, § 163.035(4) states that the statute "does not deprive a governmental entity from raising customary use as an affirmative defense in any proceeding challenging an ordinance or rule adopted before July 1, 2018."  Fla. Stat. § 163.035(4).  The Ordinance was passed on June 6, 2018.  See Ord. No. 2018-03.  Thus, a plain reading of § 163.035(4) supports the conclusion that the Town was permitted to keep the Ordinance in effect after July 1, 2018 and raise an affirmative defense of customary use in defending against the Property Owners' lawsuit.  Daniels, 898 So. 2d at 64.

We therefore vacate the District Court's ruling that the Ordinance is void under § 163.035 because it was kept in effect after July 1, 2018.  We next turn to the District Court's finding that the Town failed to provide sufficient evidence to establish the asserted customary use.

B. <u>The District Court erred granting summary judgment to the Property Owners on the Town's customary use defense.</u>

The District Court found that the Town failed to prove its affirmative defense of customary use as a matter of law, granting summary judgment to the Property Owners on this issue.  But because we conclude the District Court impermissibly weighed the evidence at the summary judgment stage, see Jones, 683 F.3d at 1292, we vacate this ruling.

11

To resolve whether the Town has shown customary use over the dry sand beach in dispute, we look to Florida law.  See Shapiro v. Associated Int'l Ins. Co., 899 F.2d 1116, 1118 (11th Cir. 1990) (federal courts are bound to follow the decisions of the Florida Supreme Court on issues of Florida state law).

In addressing property disputes, Florida courts have long recognized the unique nature of its beaches.  In White v. Hughes, 190 So. 446 (Fla. 1939), the Florida Supreme Court wrote:

> There is probably no custom more universal, more natural or more ancient, on the sea-coasts, not only of the United States, but of the world, than that of bathing in the salt waters of the ocean and the enjoyment of the wholesome recreation incident thereto.  The lure of the ocean is universal; to battle with its refreshing breakers a delight.  Many are they who have felt the lifegiving touch of its healing waters and its clear dust-free air.  Appearing constantly to change, it remains ever essentially the same.  This primeval quality appeals to us. 'Changeless save to the wild waves play, time writes no wrinkles on thine azure brow; such as creation's dawn beheld, thou rollest now.'  The attraction of the ocean for mankind is as enduring as its own changelessness.  The people of Florida—a State blessed with probably the finest bathing beaches in the world—are no exception to the rule.  Skill in the art of swimming is common amongst us.  We love the oceans which surround our State.  We, and our visitors too, enjoy bathing in their refreshing waters.  The constant enjoyment of this privilege of thus using the ocean and its fore-shore for ages without dispute should prove sufficient to establish it as an American common law right.

Id. at 448–49.

12

The Florida Supreme Court first articulated the customary use doctrine in 1974. See Tona-Rama, 294 So. 2d at 78. In Tona-Rama, the Florida Supreme Court explained that the public could continue using the dry sand area adjoining a tourist attraction if such recreational use were "ancient, reasonable, without interruption and free from dispute." Id. In describing the rationale underlying customary use, the Florida Supreme Court wrote that

> [n]o part of Florida is more exclusively hers, nor more properly utilized by her people than her beaches. And the right of the public of access to, and enjoyment of, Florida's oceans and beaches has long been recognized by this Court. . . . The beaches of Florida are of such a character as to use and potential development as to require separate consideration from other lands with respect to the elements and consequences of title. The sandy portion of the beaches are of no use for farming, grazing, timber production, or residency—the traditional uses of land— but has served as a thoroughfare and haven for fishermen and bathers, as well as a place of recreation for the public. The interest and rights of the public to the full use of the beaches should be protected.

Id. at 75, 77.

The Florida courts of appeals have also written on the doctrine. See Blanchard v. State Farm Mut. Auto. Ins. Co., 903 F.2d 1398, 1399 (11th Cir. 1990) (in the absence of a ruling by the Florida Supreme Court, decisions of the Florida District Courts of Appeal are controlling). In Reynolds v. County of Volusia, 659 So. 2d 1186 (Fla. 5th DCA 1995), the Fifth District Court of Appeal noted that "the doctrine of customary usage of the sandy beach areas of this state offer[ed] a

potential . . . ground" to affirm the ruling that there was no taking in the case. Id. at 1190–91. The Fifth District Court of Appeal reiterated the requirements of the customary use doctrine, explaining that it "requires the courts to ascertain in each case the degree of customary and ancient use the beach has been subjected to and, in addition, to balance whether the proposed use of the land by the fee owners will interfere with such use enjoyed by the public in the past." Id. at 1190. But because it determined the title at issue did not include the dry sand beach, the court did not have to reach the issue of whether customary use existed in the case. Id. at 1190–91; see also id. at 1187–88.

The Fifth District Court of Appeal again discussed customary use in Trepanier v. County of Volusia, 965 So. 2d 276 (Fla. 5th DCA 2007). In this case, the Fifth District Court of Appeal instructed that to establish a customary right the local government need not prove customary use of the property owners' specific parcels of property. Id. at 290. Instead, the court read the Florida Supreme Court's decision in Tona-Rama to "require proof that the general area of the beach where [the private] property is located has customarily been put to such use." Id. (emphasis added). The court then found that issues of fact precluded a determination on customary use and required remand. Id. at 290–91.

Finally, we note that the Florida legislature has also recognized the public's reasonable access to beaches. See Fla. Stat. § 187.201(8)(b)(2) (stating as part of

14

the State Comprehensive Plan that it is a state goal to "[e]nsure the public's right to reasonable access to beaches"). In sum, Florida state law confirms that the public's right to access to the dry sand beaches can be acquired by custom, which is "a source of law that emanates from long-term, open, obvious and widely-accepted and widely-exercised practice." Trepanier, 965 So. 2d at 289.

With these principles in mind, we consider whether, on this record, the District Court properly granted summary judgment to the Property Owners on the issue of customary use. We don't believe it did. Based on our review of the evidence, we conclude that genuine disputes of material fact preclude summary judgment.

Recall that the Town has a total area of only 1.3 square miles, 0.4 square miles of which is land and 0.9 square miles is water.[2] The question of customary use is a localized inquiry, in this case implicating fairly limited stretches of beachfront. The Town may establish customary use by showing that the "general area" of the beaches has been subject to customary use that is "'ancient, reasonable, without interruption and free from dispute.'" Trepanier, 965 So. 2d at 290–91 (quoting Tona-Rama, 294 So. 2d at 78).

_____

[2] See Redington Beach Map and Weather, http://www.redingtonbeachflorida.org/Redington_Beach_Map_Weather.html (last visited Aug. 20, 2021).

The Town provided a range of evidence supporting its customary use defense. Charles Redington, who founded the Town in 1935, see Ord. No. 2018-03, donated beach access points, which have existed since the Town's inception. These access points, in the form of boardwalks, are repaired and maintained by the Town. The Town code, in turn, defines a "beach access point" as "[a]ny access used by the general public or private property owners for the purpose of gaining access to the beach." Town Code § 4-9(b) (emphasis added).

Of course, the beach access points could be consistent with merely the use of the wet sand, but additional evidence supports the Town's assertion of customary use of the dry sand beach as well. For one, the Town has traditionally expended public funds to rake the beach. And the Town holds events every year on the dry sand beach that are not at the Town park. These include a "hotdog cookout" held on the Fourth of July and one or two beach cleanups a year sponsored by the Redington Beach Property Owners' Association.

As further indication that the Town was designed to accommodate visitors, who may not want to come if they could not access the beaches, we note that visitors may stay at vacation rental units or a hotel in the Town. The record includes one example of a mansion with eight bedrooms, rented out at a rate of $25,000 a week, which saw as many as "40 to 50" visitors a week. The Town

16

maintains over 20 parking spaces for visitors. All of this evidence suggests there are customs, housing, and parking supporting visitors' use of the beaches.

Beyond that, the Town provided testimonial and photographic evidence supporting the longstanding perception that the Town's beaches are available for public use. As one longtime resident attested, "It's always been a public beach." The mayor, who moved to the Town as a child in 1955, testified that people "just felt like the beach was there for us to enjoy and use." A Town Commissioner attested to raising his children in the Town and, throughout those years, accessing the dry sand beach through the public access points. He testified that at no point was he told that he and his family could not be on the dry sand beach. The Town's corporate representative also testified that she would run on the dry sand. The representative testified that she saw others on the dry sand areas outside of the bounds of the city park. As one example, she said she saw fisherman waiting on the dry sand beach while their poles were mounted in the wet sand. Another Town commissioner also testified that his family would routinely use the dry sand areas behind the homes and that he had "been doing this for years." Several commissioners identified some of the pictures of people gathering on the dry sandy areas of the beach behind a resident's home.

Even some of the testimony by the plaintiffs supports customary use. Two plaintiffs attested to observing people using the dry sandy areas behind their own

houses, including at the time they purchased their homes. Thomas Brown said that in 2017 when he toured the house that he bought, "the residents were out [on the dry beach] for sure" "picknick[ing] or . . . on beach chairs" or the like. He also testified that, over the next year, "[o]n occasion there were people on the beach" behind his house and that he "assumed they were residents" of the town. He admits he had "seen people out there," referring to the dry sand beach behind his house, before the Ordinance was enacted. Wendy Fields testified that her real estate agent told her before she and her husband bought the house that they "could not stop people from walking across[]" the dry sand beach behind the house.

As such, the Town provided evidence suggesting that residents and nonresidents alike use the dry sand beaches, including residents who do not own beachfront property. This overview of the evidence is not exhaustive. Nevertheless, it reflects competent evidence put forward by the Town in support of its customary use defense.

We think the District Court made two errors in granting summary judgment to the Property Owners. First, it discounted the evidence supporting customary use. The District Court dismissed the Town's evidence as "anecdot[al]," "too weak," "not limited to Property Owners' properties," and "too imprecise to establish recreational customary use of the particular area of the beach at issue." In so doing, however, the District Court impermissibly weighed a conflicting record,

18

see Jones, 683 F.3d at 1292, and disregarded the Florida courts' rulings on the topic of customary use. Those rulings say that customary use "require[s] proof that the general area of the beach where [the private] property is located has customarily been put to such use," and that Florida courts do not "suggest that the [local government] must prove [customary use of property owners'] specific parcels of property." Trepanier, 965 So. 2d at 290 (emphasis added).

Second, the District Court appeared to discount the uses of the beach that were not adverse to the owner's use. But the Florida doctrine of customary use does not impose an adversity requirement, and the doctrine applies even where the owner has given actual or implicit permission. See Tona-Rama, Inc., 294 So. 2d at 76, 78 (contrasting prescriptive easement, which has an adversity requirement, with customary use, which does not); see also 1 Blackstone, supra, at *77 (explaining that customary use is "peaceable, and acquiesced in"). For instance, the District Court dismissed evidence showing public use simply because the beachgoers could have been "invitees of the property owners." But pictures of large town gatherings on the dry sandy areas of the beach are not irrelevant to determining customary use just because a property owner may have attended the gathering or because the attendees might have had permission to be there.

On this record, we conclude that issues of material fact remain as to whether the public's use of the Town's dry sand beaches is "ancient, reasonable, without

19

interruption and free from dispute." Tona-Rama, 294 So. 2d at 78. We stress that the Town of Redington Beach is a planned community that appeared to intend to provide beach access to its residents and covers a very limited stretch of beachfront. This appeal concerns a limited amount of beachfront property in a small town. Given this context, we conclude the evidence here was sufficient to create genuine disputes of material fact on customary use.

We decline to decide whether the Town has established customary use. Instead, we vacate the District Court's grant of summary judgment to the Property Owners on the Town's customary use defense and remand for further determination of the issue.

C. The District Court erred in finding a facial and an as-applied taking.

Next is the Property Owner's claim that the Ordinance constituted an unlawful taking in violation of the Fifth Amendment of the U.S. Constitution and Article X of the Florida Constitution. U.S. Const. amend. V; Fla. Const. Article X, § 6(a); see also St. Johns River Water Mgmt. Dist. v. Koontz, 77 So. 3d 1220, 1226 (Fla. 2011) (the takings clause of the Fifth Amendment and the takings clause of the Florida Constitution are interpreted coextensively), rev'd on other grounds, 570 U.S. 595, 133 S. Ct. 2586 (2013).

The District Court found that because the Town's customary use defense failed, the Town had necessarily effected an unlawful taking of property. We

20

vacate the District Court's grant of summary judgment to the Property Owners on the federal and state takings claims, because the Town may establish its customary use defense on remand.

D. The District Court erred in finding that the Town violated Ms. Fields's First Amendment rights.

Finally, we address Ms. Fields's First Amendment retaliation claim. The District Court granted summary judgment to Ms. Fields, but we conclude genuine disputes of material fact remain about whether Fields resigned, and thus whether she suffered an adverse employment action in the first place.

In evaluating claims that a public employee suffered an adverse employment action based on expressive conduct or speech, courts must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734–35 (1968); see Moss v. City of Pembroke Pines, 782 F.3d 613, 617–18 (11th Cir. 2015) (setting forth the Pickering balancing test). But whether an employee suffered an "adverse employment action" is a "preliminary matter" that must be resolved first. Cook v. Gwinnett Cnty. Sch. Dist., 414 F.3d 1313, 1318 (11th Cir. 2005).

21

Here, the District Court granted summary judgment to Ms. Fields after finding that she had not resigned, but rather was terminated from the Board of Adjustment. The court noted that the Town took a "conflicting position on this issue," appearing to argue in one set of summary judgment briefing that Ms. Fields "voluntarily resigned," but in its response to Fields's summary judgment motion failed to dispute her characterization that she was "removed from the Board [of Adjustment]." The court then found that it was "undisputed that Fields refused to offer her resignation in writing and the Commission then unanimously voted to remove Fields from the Board." From this, the District Court decided that the record "does not support the Town's argument . . . that Fields voluntarily resigned from the Board."

However, the District Court did not address whether Ms. Fields may have resigned orally during the Town Commission meeting. The Town argues she resigned orally at the meeting because she said she would be "more than happy to" resign if asked. The Commissioners stated they did want Ms. Fields to resign, and she responded that she "accepted." The mayor then requested that the resignation be submitted "in writing," which, of course, it was not. The record contains further conflicting evidence on whether Ms. Fields resigned. For her part, Ms. Fields

22

testified that she did not believe she resigned at the meeting.[3]  Although the committee meeting minutes state Ms. Fields volunteered to resign and the Commissioners accepted her resignation, Fields disputed the accuracy of these notes, testifying she "saw what the meeting notes said" and believed it was "very different than what [her] memory was."  Given this conflicting evidence on whether Ms. Fields actually resigned at the Town Commission meeting, summary judgment on this claim was improper.

Because a resolution of whether Ms. Fields resigned is a precursor to evaluating her claim of First Amendment retaliation, we must vacate the grant of summary judgment to Fields and remand the claim for further proceedings.

---

[3] At her deposition, Ms. Fields testified as follows:

> Q:  So you said that you would resign.  They asked for formal resignation in writing, but your recollection is you did not resign at that meeting?
>
> A:  I said "I would resign" is the exact words.
>
> Q:  Okay.
>
> A:  But after thinking there were complaints against me.  If there were complaints against me and I was doing a poor job, I would resign.  But there were no complaints against me.  They had no documentation.  If they had, I would have forwarded my resignation. . . . So I chose not to resign because I liked what I was doing.

R. Doc. 51-1 at 41–42.

**IV**

We vacate the judgment of the District Court and remand the case for further proceedings consistent with this opinion.

**VACATED and REMANDED.**