[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-13070

_____

HEATHER KOKESCH DEL CASTILLO,

Plaintiff-Appellant,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF HEALTH,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:17-cv-00722-MCR-HTC

_____

Before BRANCH, LUCK, and ED CARNES, Circuit Judges.

LUCK, Circuit Judge:

Heather Kokesch Del Castillo, an unlicensed dietician and nutritionist, claims that Florida's Dietetics and Nutrition Practice Act, which requires a license to practice as a dietician or nutritionist, violates her First Amendment free speech rights to communicate her opinions and advice on diet and nutrition to her clients. The district court granted summary judgment for the Florida Department of Health, which enforces the Act, on Del Castillo's First Amendment free speech claim because, the district court concluded, it was bound by our decision in *Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011). *Locke* held that a similar state licensing scheme for commercial interior designers did not violate the free speech rights of unlicensed interior designers.

Del Castillo argues that the district court erred, and we are not bound by *Locke*, because *Locke* was abrogated by the Supreme Court's decision in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018). So the narrow question for us is whether *Locke* is still good law after *NIFLA*. After reviewing what we said in *Locke*, what the Supreme Court said in *NIFLA*, and our prior panel precedent rule, we hold that it is. And because *Locke* is still good law, we conclude that we are bound to affirm the district court's summary judgment for the department.

## FACTUAL BACKGROUND

Del Castillo owned and operated a health-coaching business called Constitution Nutrition. She started her business in California, which did not require her to have a license to operate it. After moving to Florida in 2015, Del Castillo continued to run her business—meeting online with most of her clients and meeting in person with two clients who lived in Florida. She described herself as a "holistic health coach" and not as a dietician. Del Castillo tailored her health coaching to each client, which included dietary advice. She advertised her business in a local health magazine, on Facebook, and on flyers at a local gym.

Del Castillo's business focused on "[o]ne-on-one health coaching," which she described as "meeting with clients and discussing overall health and wellness, as well as goal setting." She gave them tailored advice on dietary choices, exercise habits, and general lifestyle strategies. For example, Del Castillo recommended vitamin supplements to some clients with low energy and told them to consult with their physicians before taking the supplements. For another client with food intolerances, Del Castillo recommended health goals that fit within a list of foods to avoid provided by the client's doctor.

Before her initial consultation with a new client, Del Castillo would ask them to fill out a "health history form." The health history form sought general background information about the client, like his or her age and occupation, as well as particulars about the client's dietary health, including past serious illness or recent

weight change.  Del Castillo used this form to get an overall picture of her client's health but did not make medical conclusions.  Instead, she would recommend that a client consult a doctor if the client had experienced something unusual like drastic weight loss. Del Castillo never held herself out to her clients as a health care professional, never gave a diagnosis or provided medical treatment, and never gave advice contrary to physician advice.

Del Castillo had a certificate in holistic health coaching that she received from an online school.  But she did not have a Florida dietician or nutritionist license.  Del Castillo was not qualified to receive a license because she lacked the necessary education and professional experience.

Del Castillo's lack of a license eventually became a problem for her business.  Florida regulates dietetics and nutrition counseling through the Dietetics and Nutrition Practice Act.  Fla. Stat. §§ 468.501–.518.  The Act defines "[d]ietetics" as "the integration and application of the principles derived from the sciences of nutrition, biochemistry, food, physiology, and management and from the behavioral and social sciences to achieve and maintain a person's health throughout the person's life."  *Id.* § 468.503(4).  It defines "[n]utrition counseling" as "advising and assisting individuals or groups on appropriate nutrition intake by integrating information from the nutrition assessment." *Id.* § 468.503(10).  The Act provides that "[d]ietetics and nutrition practice" "include[s] assessing nutrition needs and status using appropriate data; recommending appropriate dietary regimens, nutrition support, and nutrient intake;

ordering therapeutic diets; improving health status through nutrition research, counseling, and education; and developing, implementing, and managing nutrition care systems." *Id.* § 468.503(5). And, relevant to this appeal, the Act provides that "[n]o person may engage for remuneration in dietetics and nutrition practice or nutrition counseling or hold himself or herself out as a practitioner of dietetics and nutrition practice or nutrition counseling unless the person is licensed in accordance with the provisions of this part." *Id.* § 468.504. Under the Act, a person who knowingly engages in unlicensed "dietetics and nutrition practice or nutrition counseling for remuneration" commits "a misdemeanor of the first degree." *Id.* § 468.517(1), (2).

In March 2017, a licensed dietician filed a complaint against Del Castillo with the Florida Department of Health, alleging that Del Castillo was violating the Act by providing nutritionist services without a license. The department's practice was to investigate every complaint, so it opened an investigation into Del Castillo. A department investigator posed as a client and contacted Del Castillo about her services. In response, Del Castillo described her services and provided the investigator with a health history form to fill out. The department concluded that Del Castillo was violating the Act and, in May 2017, sent her a citation and a cease-and-desist order. Del Castillo paid the department $500.00 in fines and $254.09 in investigatory fees for "providing individualized dietary advice in exchange for compensation in Florida."

## PROCEDURAL HISTORY

Del Castillo brought a 42 U.S.C. section 1983 action against the department, claiming that the Act, as applied to her, violated her First Amendment free speech rights. She sought a declaratory judgment that the Act is "unconstitutional to the extent that [it] prohibit[s] [her] and others similarly situated from offering individualized advice about diet and nutrition." She also requested injunctive relief and attorneys' fees and costs.

After discovery, both parties moved for summary judgment. The department argued that the Act was a lawful regulation of the dietetics and nutritionist profession. Because any restriction of Del Castillo's speech was merely incidental to the regulation of professional conduct, the department maintained, the Act was not subject to First Amendment scrutiny and did not violate Del Castillo's free speech rights. The department relied on our decision in *Locke*, which upheld Florida's licensing scheme for interior designers against a free speech challenge similar to Del Castillo's challenge in this case because that regulation governed occupational conduct with only an incidental effect on speech.

Del Castillo argued in her motion for summary judgment that her dietary advice to her clients was pure speech rather than conduct. Del Castillo argued that the Act was a content-based regulation of her speech and was, therefore, subject to strict scrutiny. The Act couldn't survive strict scrutiny, Del Castillo maintained, because it wasn't narrowly tailored to address a compelling government interest. Finally, Del Castillo argued that *Locke* had been

abrogated by the Supreme Court's recent decision in *NIFLA* because *Locke* relied on the "professional speech doctrine" and the *NIFLA* Court "expressly rejected the professional speech doctrine."

The district court granted the department's motion for summary judgment and denied Del Castillo's. It concluded that our "binding" decision in *Locke* "controls the outcome of this case." The district court explained that in *Locke*, we rejected a challenge to Florida's licensing scheme for commercial interior designers because a statute that governs "the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." The district court said that *Locke* also relied on the principle that "generally applicable licensing provisions limiting the class of persons who may practice the profession" are not subject to First Amendment scrutiny.

The district court concluded that the Act's dietician and nutrition licensing scheme was like the licensing scheme we upheld in *Locke*. This was because, the district court said, the licensing scheme that Del Castillo challenged had an "impact on speech" that was "merely incidental to the regulation of the profession" of dieticians and nutritionists. The district court concluded that, under *Locke*, the Act was "not subject to heightened scrutiny because it is a generally applicable professional licensing statute with a merely incidental impact on speech."

The district court rejected Del Castillo's argument that the Supreme Court's decision in *NIFLA* had abrogated *Locke*. The

district court reasoned that although the *NIFLA* Court had declined to recognize "professional speech" as a unique category of speech exempt from ordinary First Amendment principles, the second reason for *Locke's* holding, it had reaffirmed that states "may regulate professional conduct, even though that conduct incidentally involves speech," consistent with the first reason for *Locke*'s holding. Thus, the district court applied rational basis review to Del Castillo's First Amendment claim and concluded that the Act was rationally related to a legitimate state interest: the promotion of public health and safety.

Del Castillo appeals the district court's summary judgment for the department.[1]

---

[1] After we heard oral argument in this case, the department filed a motion to dismiss the appeal as moot. In 2020, Florida amended the Act to exempt from the state's licensing requirement certain persons providing nutritional advice. The new exception applies to:

> Any person who provides information, wellness recommendations, or advice concerning nutrition, or who markets food, food materials, or dietary supplements for remuneration, if such person does not provide such services to a person under the direct care and supervision of a medical doctor for a disease or medical condition requiring nutrition intervention, not including obesity or weight loss, and does not represent himself or herself as a dietitian, licensed dietitian, registered dietitian, nutritionist, licensed nutritionist, nutrition counselor, or licensed nutrition counselor, or use any word, letter, symbol, or insignia indicating or implying that he or she is a dietitian, nutritionist, or nutrition counselor.

## STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Buending v. Town of Redington Beach*, 10 F.4th 1125, 1130 (11th Cir. 2021). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a court must "resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor." *Buending*, 10 F.4th at 1130 (quotation marks omitted).

---

Fla. Stat. § 468.505(1)(n) (2020). The department argues that this amendment exempts Del Castillo's business and moots her appeal. Del Castillo responds that her business is not covered by the new exception because she has had, and in the future wants to be free to have, clients who are "under the direct care and supervision of a medical doctor for a disease or medical condition requiring nutrition intervention."

"Generally, when an ordinance is repealed any challenges to the constitutionality of that ordinance become moot." *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir. 2000). But, "when an ordinance is repealed by the enactment of a superseding statute, then the superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law." *Id.* (quotation marks omitted). Here, the amendment to the Act did not remove all of the Act's features that Del Castillo challenged. Del Castillo still challenges the part of the Act prohibiting her from giving dietetic and nutritional advice to paying clients who are under the supervision of a doctor for a disease or medical condition requiring nutrition intervention. Thus, her First Amendment challenge to the Act is not moot.

## DISCUSSION

Del Castillo argues that the Act, as applied to her and her business of giving clients individualized dietary and nutrition advice, is a content-based regulation of speech that is subject to strict scrutiny. She contends that the district court erred in relying on *Locke* because *NIFLA* abrogated *Locke*. And regardless of what level of scrutiny we apply to the Act, Del Castillo argues, the department failed to justify the burden on her First Amendment free speech rights.

We conclude that *Locke* is still good law and controls the outcome of this case. We break up our discussion into four parts. First, we discuss *Locke* and the two reasons the *Locke* court gave for why Florida's interior designer licensing scheme did not violate the First Amendment: the professional speech doctrine; and the licensing scheme regulated professional conduct with only an incidental effect on speech. Second, we review *NIFLA*, its refusal to recognize the professional speech doctrine, and its reaffirmation that the regulation of professional conduct that has only an incidental effect on speech does not violate the First Amendment. Third, we apply our prior panel precedent rule and discuss how one of the two independent reasons for our decision in *Locke*—that the regulation of professional conduct with an incidental effect on speech does not violate the First Amendment—was not abrogated by, but instead survived, *NIFLA*. And finally, we apply *Locke* to this case and conclude that the Act's dietician and nutritionist licensing scheme did not violate Del Castillo's free speech rights

because, like the interior designer licensing scheme in *Locke*, the Act regulated her professional conduct and had only an incidental effect on her speech.

### *Our decision in* Locke v. Shore

*Locke* involved a First Amendment free speech challenge to a Florida law "requir[ing] interior designers practicing in nonresidential, commercial settings within the state to obtain a state license." 634 F.3d at 1189. The statute defined "'interior design' as 'designs, consultations, studies, drawings, specifications, and administration of design construction contracts relat[ed] to nonstructural interior elements of a building or structure." *Id.* (quoting what is now Fla. Stat. § 481.203(10)). To get a license, a designer had to "complete a combined total of six years of interior design education and internship experience with a licensed interior designer" and "pass an examination administered by the National Council of Interior Design Qualifications." *Id.* "Practicing interior design in commercial settings in Florida without a license" could result in a misdemeanor charge and an administrative penalty. *Id.* at 1189–90.

The plaintiffs were educated and trained in interior design and practiced in residential settings in Florida. *Id.* at 1190. They "wish[ed] to expand their practice to commercial settings," but they were not licensed as interior designers by the state. *Id.* The plaintiffs "argue[d] that the license requirement unconstitutionally burden[ed] protected speech under the First Amendment." *Id.* at 1191. "We conclude[d] that Florida's license requirement [was]

constitutional under the First Amendment," *id.* at 1192, and gave two distinct reasons for our holding.

The first reason we gave was that a "statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." *Id.* at 1191 (quotation marks omitted). We relied, in part, on *Wilson v. State Bar of Georgia*, 132 F.3d 1422, 1430 (11th Cir. 1998), which recognized that "regulations that 'govern occupational conduct' with only an 'incidental effect' on speech withstand First Amendment scrutiny." *Locke*, 634 F.3d at 1191 (parenthetically quoting from *Wilson*). "Because the [interior designer] license requirement govern[ed] 'occupational conduct, and not a substantial amount of protected speech,'" *Locke* said, it did "not implicate constitutionally protected activity under the First Amendment." *Id.* (quoting *Wilson*, 132 F.3d at 1429).

This first reason was an independently adequate reason for our holding in *Locke*. It was not only the first reason we gave but also the reason we reiterated in the concluding paragraph of our discussion. *Id.* at 1192 (concluding "that Florida's license requirement is constitutional under the First Amendment" "[b]ecause the license requirement is a professional regulation with a merely incidental effect on protected speech"). In case there was any doubt about the matter, in her separate concurring opinion in the *Locke* case, Judge Black nailed down our holding and the reason for it. *Id.* at 1197 (Black, J., concurring in the result) ("As I understand the

majority opinion, it holds that Florida's licensing scheme does not violate the First Amendment because it is a regulation of occupational conduct with only an incidental impact on protected speech.").

As courts sometimes do, the *Locke* court also gave an additional reason for its holding. The second reason we gave for concluding that the interior designer licensing scheme did not violate the First Amendment was that, if "the government enact[ed] generally applicable licensing provisions limiting the class of persons who may practice the profession, it cannot be said to have enacted a limitation on freedom of speech . . . subject to First Amendment scrutiny." *Id.* at 1191 (majority opinion) (omission in original) (quoting *Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring)). There was "a difference," we reasoned, "for First Amendment purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients." *Id.* The interior designer "license requirement regulate[d] solely the latter," we said. *Id.* This second reason, derived from Justice White's concurring opinion in *Lowe*, is the professional speech doctrine.

Both reasons supported our conclusion that the interior designer licensing statute did not violate the plaintiffs' First Amendment free speech rights.

*The Supreme Court's decision in* NIFLA v. Becerra

*NIFLA* involved California's regulation of crisis pregnancy centers—"pro-life (largely Christian belief-based) organizations that offer a limited range of free pregnancy options, counseling, and other services to individuals that visit a center." 138 S. Ct. at 2368 (quoting report). The state's regulation required centers that qualified as licensed covered facilities to "disseminate a government-drafted notice on site," which read: "California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women." *Id.* at 2369 (quotation marks omitted).[2]

A licensed pregnancy center sued, alleging that the notice requirement "abridge[d] the freedom of speech protected by the First Amendment." *Id.* at 2370. The district court denied the center's motion for a preliminary injunction, and the Ninth Circuit affirmed because the notice requirement "survive[d] the lower level of scrutiny that applie[d] to regulations of professional speech." *Id.* (quotation marks omitted)

The Supreme Court reversed. *Id.* The Court began by explaining that when it enforces the First Amendment prohibition on the abridgment of the freedom of speech, it distinguishes "between

---

[2] California's regulation had a separate notice requirement for unlicensed pregnancy centers, *NIFLA*, 138 S. Ct. at 2369–70, but the notice requirement for unlicensed centers isn't relevant to whether *Locke* has been abrogated.

content-based and content-neutral regulations of speech." *Id.* at 2371. Content-based regulations "target speech based on its communicative content," and generally they "are presumptively unconstitutional and may be justified only if" they survive strict scrutiny—"the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (quotation marks omitted). The notice requirement for licensed pregnancy centers was a content-based regulation because it compelled the center to speak a particular message. *Id.*

But, the *NIFLA* Court explained, some courts of appeals, like the Ninth Circuit, had "recognized 'professional speech' as a separate category of speech that is subject to different rules." *Id.* (citing cases from the Third, Fourth, and Ninth Circuits). These courts defined professional speech as speech that is based on expert knowledge and judgment by individuals who provided personalized services to clients and who are subject to a generally applicable licensing and regulatory regime. *Id.* "[T]hese courts except[ed] professional speech from the rule that content-based regulations of speech are subject to strict scrutiny." *Id.*

The *NIFLA* Court refused to recognize "'professional speech' as a separate category of speech." *Id.* "Speech is not unprotected merely because it is uttered by 'professionals.'" *Id.* at 2371–72. A government cannot impose content-based restrictions on speech, the Court explained, "without persuasive evidence of a long (if heretofore unrecognized) tradition to that effect." *Id.* at 2372 (cleaned up). While the Court had never recognized "a

tradition for a category called 'professional speech,'" it has tradi-
tionally "afforded less protection for professional speech in two cir-
cumstances." *Id.*

First, the Court has "applied more deferential review to
some laws that require professionals to disclose factual, noncontro-
versial information in their 'commercial speech.'" *Id.* And second,
the Court has said that "[s]tates may regulate professional conduct,
even though that conduct incidentally involves speech." *Id.* The
Supreme Court "has upheld regulations of professional conduct
that incidentally burden speech" because the "First Amendment
does not prevent restrictions directed at commerce or conduct
from imposing incidental burdens on speech." *Id.* at 2373 (quota-
tion marks omitted).

Neither traditional circumstance applied to California's no-
tice requirement for licensed pregnancy centers. *Id.* at 2372–74.
And the *NIFLA* Court found no "persuasive reason for treating pro-
fessional speech as a unique category that is exempt from ordinary
First Amendment principles." *Id.* at 2375. Even applying the eas-
ier-to-meet standard of intermediate scrutiny, the Court concluded
that California's notice requirement couldn't meet it because the
notice requirement wasn't sufficiently drawn to achieve the state's
claimed substantial interest. *Id.* at 2375–76.

## NIFLA *did not abrogate* Locke

Del Castillo argues that *NIFLA* abrogated *Locke*. And her
argument goes something like this. *Locke*'s holding relied on the

"professional speech doctrine" to conclude that Florida's interior designer licensing scheme did not violate the plaintiffs' First Amendment free speech rights. But *NIFLA* rejected the "professional speech doctrine." So the prop supporting *Locke*'s holding has been taken away, and *Locke* has been abrogated. For three reasons, we disagree.

First, *Locke*'s First Amendment holding relied on more than the "professional speech doctrine." The *Locke* court also concluded that the interior designer licensing requirement did not violate the First Amendment because it was "a professional regulation with a merely incidental effect on protected speech." 634 F.3d at 1192; *see also id.* at 1197 (Black, J., concurring in the result) ("As I understand the majority opinion, it holds that Florida's licensing scheme does not violate the First Amendment because it is a regulation of occupational conduct with only an incidental impact on protected speech."). "A statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." *Id.* at 1191 (majority opinion).

Second, while the *NIFLA* Court "refused to recognize professional speech as a new speech category deserving less protection," *Otto v. City of Boca Raton*, 981 F.3d 854, 867 (11th Cir. 2020), it also reaffirmed that "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech," *NIFLA*, 138 S. Ct. at 2372. The *NIFLA* Court explained that "regulations of

professional conduct that incidentally burden speech" have been "upheld," and the "First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* at 2373 (quotation marks omitted).

Third, *NIFLA* did not undermine *Locke* to the point of abrogation. "We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision." *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998). A prior panel precedent is "undermined," we explained in *United States v. Petite*, where the "Supreme Court's subsequent decision . . . so *fully* undermined our prior panel's decision . . . as to abrogate its holding." 703 F.3d 1290, 1297 (11th Cir. 2013) (emphasis added). To "fully undermine[]" a prior panel decision, the later Supreme Court decision must "demolish[]" and "eviscerate[]" each of its "fundamental props." *See id.* at 1297–98. Because *Locke*'s holding relied on more than the "professional speech doctrine"—and the only thing *NIFLA* refused to recognize was the "professional speech doctrine"—both of *Locke*'s props have not been demolished; its holding is still standing.

The *NIFLA* Court spoke with unmistakable clarity about the line of precedents upholding regulations of professional conduct that incidentally burden speech and another line of precedents (upholding laws compelling the disclosure of information in certain contexts): "neither line of precedents is implicated here." 138 S. Ct. at 2372. Reasoning based on a line of Supreme Court

precedents that the Court itself emphasizes in a later decision is not implicated by that later decision cannot have been rejected, overruled, or abrogated by the later decision.

So what we have here is a prior panel precedent—the holding in *Locke*—that rests on two bases, only one of which has been rejected by the Supreme Court while the other basis has not been. If anything, that surviving basis or rationale has been endorsed by the Supreme Court. And it takes only one valid basis or rationale for a prior holding to make it binding precedent. *See McLellan v. Miss. Power & Light Co.,* 545 F.2d 919, 925 n.21 (5th Cir. 1977) (en banc) ("It has long been settled that all alternative rationales for a given result have precedential value."); *see also Massachusetts v. United States,* 333 U.S. 611, 623 (1948) (explaining that where a case has "been decided on either of two independent grounds" and "rested as much upon the one determination as the other," the "adjudication is effective for both").

Two of our decisions illustrate this point. The first is an example of a dual-rationale prior precedent that was abrogated by a supervening Supreme Court decision because the supervening Supreme Court decision was inconsistent with both rationales of the prior precedent. In the *Petite* case, "we ha[d] a prior panel opinion on all fours with the case before us." 703 F.3d at 1297. That prior panel decision was *United States v. Harrison*, 558 F.3d 1280 (11th Cir. 2009). *Petite*, 703 F.3d at 1297. "In *Harrison*"—the prior panel opinion—we had "held that the offense of simple vehicle flight . . . —the same offense at issue [in *Petite*]—was *not* a violent felony for

purposes of the Armed Career Criminal Act." *Id.* "*Harrison*," we said, "rested on two fundamental props." *Id.* "The first foundational prop was the panel's conclusion that Florida's simple vehicle flight offense, as ordinarily committed, was not 'roughly similar' to the ACCA's enumerated offenses in 'degree of risk posed.'" *Id.* (quoting *Harrison*, 558 F.3d at 1294). "The second prop on which the panel's holding in *Harrison* rested was that, even assuming a serious potential risk of physical injury exists . . . Florida's simple vehicle flight offense was not roughly similar in kind to the ACCA's enumerated offenses." *Id.* (cleaned up).

But both of those two "foundations of *Harrison* were demolished by the Supreme Court's subsequent decision in *Sykes* [*v. United States*, 564 U.S. 1 (2011)]."[3] *Petite*, 703 F.3d at 1298. "As for the degree of risk posed by vehicle flight"—the first prop—"the Supreme Court rejected our prior panel's risk calculus, which had suggested that the confrontational act of vehicle flight does not necessarily translate into a serious potential risk of physical injury in the absence of high speed or reckless driving on the part of the offender." *Id.* (quotation marks omitted). And "[t]he Supreme Court in *Sykes* also eviscerated the second of *Harrison*'s props— that, even assuming a serious risk of injury, simple vehicle flight was not a violent felony for ACCA purposes because it was not

---

[3] *Sykes* and *Petite* both involved an analysis under the ACCA's residual clause, a provision which has since been declared unconstitutionally vague. *See Johnson v. United States*, 576 U.S. 591 (2015).

similar in kind to the ACCA's enumerated crimes." *Id.* Because *Sykes* demolished both of the two foundations supporting *Harrison*'s holding, we concluded in *Petite* that *Harrison* had been so fully undermined that it had been abrogated by *Sykes*. *Id.* at 1299. This is what it takes for a Supreme Court decision to demolish or eviscerate a prior precedent.

The other example of a dual-rationale prior precedent illustrates what happens when only one of two rationales is rejected by a later Supreme Court decision. *See DeLong Equip. Co. v. Wash. Mills Electro Mins. Corp.*, 997 F.2d 1340 (11th Cir. 1993). We held in *DeLong Equipment* that postjudgment interest would be awarded from the date of the original judgment, rather than from the date of the judgment on remand. *Id.* at 1341. That holding was consistent with *Woods Exploration & Producing Co. v. Aluminum Co. of America*, 509 F.2d 784 (5th Cir. 1975), which was binding "prior precedent" from the former Fifth Circuit. *DeLong Equip. Co.*, 997 F.2d at 1342.

We acknowledged in *DeLong Equipment* that the Supreme Court had since "rejected the narrow holding of" our *Woods Exploration* decision. *Id.* at 1342 n.1 (citing *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827 (1990)). As a result, one rationale or point on which our earlier decision had rested was gone. But we explained that the supervening Supreme Court decision "did not cast doubt on the *Woods* case's larger point that the earlier date is the one from which equity normally requires the accrual of postjudgment interest to run." *Id.* Thus, we held that the

Supreme Court's rejection of one basis or rationale of our prior decision did not change the precedential force of the rationale that was unaddressed and unabrogated by the Supreme Court. *See id.* The situation in *Locke* is like the situation in *DeLong Equipment*. The point we made in *Locke* about the regulation of professional conduct that incidentally burdened speech remains undisturbed and binding.

Here, unlike in *Petite*, the Supreme Court has not "demolished" or "fully undermined" both props making up *Locke*'s foundation. *Locke*, like our prior panel decision in *Harrison*, relied on two props to hold that Florida's interior designer licensing scheme did not violate the plaintiffs' First Amendment free speech rights: (1) "the license requirement [was] a professional regulation with a merely incidental effect on protected speech"; and (2) the professional speech doctrine. *Locke*, 634 F.3d at 1191–92. In *NIFLA*, the Supreme Court refused to recognize the "professional speech" doctrine. *See Otto*, 981 F.3d at 861 (explaining that the Supreme Court in *NIFLA* "rejected an attempt to regulate speech by recharacterizing it as professional conduct"). But the *NIFLA* Court reaffirmed that "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." 138 S. Ct. at 2372; *see also id.* at 2373 ("[T]his Court has upheld regulations of professional conduct that incidentally burden speech.").

After *NIFLA*, one of the two props supporting *Locke*'s foundation still stands. It has not been eviscerated. It has not been demolished. And it is has not been undermined. "[W]e are not at

liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court." *Fla. League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996); *see also United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) ("[T]he doctrine of adherence to prior precedent also mandates that the intervening Supreme Court case actually abrogate or directly conflict with, as opposed to merely weaken, the holding of the prior panel." (quotation marks omitted)). Unlike in *Petite*, because only one—but not both—of *Locke*'s independently adequate props has been taken away, we are not compelled to conclude that *Locke* has been so fully undermined as to be abrogated by *NIFLA*.

Rather, under our prior precedent rule, *Locke*'s first rationale is still good law: "A statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." 634 F.3d at 1191. We must follow this part of *Locke* to the extent it applies to Del Castillo and the Act's licensing scheme for dieticians and nutritionists. And, as we explain below, it does apply.

### Locke *controls the First Amendment question here*

Applying *Locke* to this case, we conclude that the Act's licensing scheme for dieticians and nutritionists regulated professional conduct and only incidentally burdened Del Castillo's speech. Because the burden on her speech rights was only

incidental, the Act's licensing scheme did not violate her First Amendment free speech rights. *See Locke*, 634 F.3d at 1192.

The Act regulates "dietetics and nutrition practice," Fla. Stat. § 468.504, which involves

> assessing nutrition needs and status using appropriate data; recommending appropriate dietary regimens, nutrition support, and nutrient intake; ordering therapeutic diets; improving health status through nutrition research, counseling, and education; and developing, implementing, and managing nutrition care systems, which includes, but is not limited to, evaluating, modifying, and maintaining appropriate standards of high quality in food and nutrition care services.

*Id.* § 468.503(5). And the Act regulates "nutrition counseling," *id.* § 468.504, which entails "advising and assisting individuals or groups on appropriate nutrition intake by integrating information from the nutrition assessment," *id.* § 468.503(10). In enacting this regulation, the Florida legislature specifically found that "the *practice* of dietetics and nutrition or nutrition counseling by unskilled and incompetent practitioners presents a danger to the public health and safety." *Id.* § 468.502 (emphasis added).

Assessing a client's nutrition needs, conducting nutrition research, developing a nutrition care system, and integrating information from a nutrition assessment are not speech. They are

"occupational conduct"; they're what a dietician or nutritionist does as part of her professional services. *See Locke*, 634 F.3d at 1191 (quotation marks omitted).

The profession also involves some speech—a dietician or nutritionist must get information from her clients and convey her advice and recommendations. But, to the extent the Act burdens speech, the burden is an incidental part of regulating the profession's conduct.

The Act's effect on speech for dieticians and nutritionists is as incidental as was the licensing scheme in *Locke*'s effect on speech for interior designers. The interior designer licensing scheme in *Locke* defined "interior design" as "designs, consultations, studies, drawings, specifications, and administration of design construction contracts relating to nonstructural interior elements of a building or structure." *Id.* at 1189 (quoting what is now Fla. Stat. § 481.203(10)). Interior design included "reflected ceiling plans, space planning, furnishings, and the fabrication of nonstructural elements within and surrounding interior spaces of buildings." *Id.* (quotation marks omitted).

But interior design also involved some speech. An interior designer not only creates designs and drawings of nonstructural interior elements of a building, *id.*; she also has to talk to her clients about their preferences and communicate the final designs and drawings to the clients. Even so, the fact that the profession involved speech did not mean that the licensing scheme for interior designers violated the First Amendment. Rather, because "the

[interior designer] license requirement [was] a professional regulation with a merely incidental effect on protected speech," we held that it was "constitutional under the First Amendment." *Id.* at 1192.

We're bound by *Locke* to reach the same conclusion here. Like the interior designer licensing scheme in *Locke*, the Act regulated the professional conduct of dieticians and nutritionists and only incidentally burdened Del Castillo's free speech rights. Because the Act "is a professional regulation with a merely incidental effect on protected speech," it is "constitutional under the First Amendment." *See id.*

**AFFIRMED.**